**GREAT WESTERN BANK, A Federal Savings Bank; Great Western Bank, A Savings Bank, Plaintiffs–Appellants,**

v.

**OFFICE OF THRIFT SUPERVISION \*, An Office of the United States Department of the Treasury, Defendant–Appellee.**

No. 89–55823.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1990.

Decided Oct. 18, 1990.

---

\* Pursuant to Fed.R.App.P. 43, the Office of Thrift Supervision, as successor in interest, is substituted for the Federal Home Loan Bank Board.

*See* Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, §§ 301, 401(g)(2), 103 Stat. 183, 278, 357.

Frank Rothman, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for plaintiffs-appellants.

Robert D. McGillicuddy, Richard J. Osterman, Jr., Washington, D.C., for the amicus curiae Federal Deposit Ins. Corp.

Steven W. Dimmick, and James A. Hendriksen, Sr. Trial Atty., on the brief, Office of Thrift Supervision, Washington, D.C., for defendant-appellee Office of Thrift Supervision.

Before FLETCHER, PREGERSON and NELSON, Circuit Judges.

PREGERSON, Circuit Judge:

Appellants Great Western Bank, a Federal Savings Bank, (GW–California) and Great Western Bank, a Savings Bank (GW–Washington) seek review of a district court judgment affirming a decision of the Federal Home Loan Bank Board (Bank Board) that denied their application to merge, thereby preventing GW–California from leaving the Federal Savings and Loan Insurance Corporation's (FSLIC's) insurance fund in order to become insured by the Federal Deposit Insurance Corporation ("FDIC"). Had GW–California been allowed to leave the FSLIC fund and become a member of the FDIC fund, it would have saved considerable sums of money in insuring its accounts. We hold that the Bank Board's decision was not arbitrary and capricious, and therefore affirm the district court's order.

## I. BACKGROUND

FSLIC was created by the National Housing Act of 1934 to insure the deposit accounts of federal savings and loan associations, federal savings banks not insured by the FDIC, and certain qualified state chartered thrifts. The Bank Board, former operating head of the FSLIC, was created by the Federal Home Loan Bank Act as an independent agency in the Executive Branch of the United States with broad discretionary powers over the Federal Home Loan Bank System. *See* 12 U.S.C. §§ 1437(a)(b), 1725(a). Federally-chartered savings and loan institutions were required to participate in the FSLIC insurance system, although they were allowed to convert from a federal to a state charter under Section 5(i)(3) of the Home Owners' Loan Act, 12 U.S.C. § 1464(i)(3), after which they had a right to withdraw from the FSLIC pursuant to 12 U.S.C. § 1730(a).[1]

Plaintiff–Appellant GW–California is a federally-chartered stock-form savings and loan association, with its principal office in Beverly Hills, California. Its deposits have been insured by the FSLIC (now the SAIF) since 1936. Plaintiff–Appellant GW–Washington is a stock-form savings bank chartered under the laws of the State of Washington whose deposit accounts are insured by the FDIC (now the BIF). Both institutions are wholly-owned subsidiaries of Great Western Financial Corporation, a Delaware holding company (GWFC).

During the past decade, hundreds of FSLIC-insured thrift institutions have failed because of changing economic conditions, mismanagement, and fraud. As a result, FSLIC paid out billions of dollars to cover insured deposits at the failed institutions and incurred additional liabilities because it had to close hundreds of problem thrifts, leaving the insurance fund insolvent by billions of dollars.

In 1985, the Bank Board attempted to replenish the FSLIC insurance fund by raising the insurance premiums charged to FSLIC-insured institutions through a "special assessment" at the maximum allowed by Congress. *See* Bank Board Res. No. 85–142, 50 Fed.Reg. 9325 (March 7, 1985); 12 U.S.C. § 1727(c). As a result, many healthy FSLIC-insured thrifts, which paid insurance premiums of approximately $2.08 per $1000 of insured deposits, took the

---

1. On August 9, 1989, while this appeal was pending, Congress enacted the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) (FIRREA). Among other things, FIRREA: (1) abolished FSLIC (§ 401(a), 103 Stat. 354); (2) transferred the responsibility of insuring the deposits of savings associations to the FDIC (§ 202, 103 Stat. 188, 12 U.S.C.A. § 1811); (3) established two separate deposit insurance funds to be managed by the FDIC—the Bank Insurance Fund (BIF), to cover the deposits of commercial banks, and the Savings Association Insurance Fund (SAIF), to cover the deposits of savings and loan associations (§ 211, 103 Stat. 218–19, 12 U.S.C.A. § 1821(a)); and (4) abolished the Bank Board, splitting its responsibilities between the FDIC and the newly created Office of Thrift Supervision (OTS) which regulates thrifts (§§ 301, 401, 103 Stat. 278, 354, 12 U.S.C.A. § 1462a(a), 1437 (note)).

In this opinion, we will often refer to the relevant agencies and insurance funds as they existed before FIRREA's enactment.

steps necessary to meet the requirements to withdraw from the FSLIC insurance system and obtain insurance from the FDIC, which charged insurance premiums of only $.83 per $1000 of insured deposits.

Congress responded to this crisis by passing the Competitive Equality Banking Act of 1987 (CEBA), Pub.L. No. 100–86, 101 Stat. 552. In CEBA, Congress attempted to address the problem of FSLIC's depleted resources by providing for a $10.825 billion recapitalization of the FSLIC fund through the sale of bonds to the public. *See* 12 U.S.C.A. § 1441(c) & (e). Interest on the bonds was paid from the assessments that the FSLIC-insured institutions pay to FSLIC. 12 U.S.C. § 1441(f).

The provision of CEBA pertinent to this case involves Congress' attempt to block healthy thrift institutions from leaving the FSLIC insurance fund in order to insure the success of the recapitalization plan. Congress gave the Bank Board the authority to charge a special "termination assessment," 12 U.S.C. § 1441(f)(4), and a "final insurance premium," 12 U.S.C. § 1730(d). Most crucial to this case, CEBA established in section 306(h) a "1–Year Prohibition on Termination of FSLIC Insured Status" which became a "Note" to 12 U.S.C. § 1730. Section 306(h) stated in pertinent part:

(h) 1–Year Prohibition on Termination of FSLIC Insured Status

(1) IN GENERAL. No association or insured institution may take any action which would result in the voluntary termination of its status as an insured institution during the 1–year period beginning on the date of the enactment of this Act [August 10, 1987].

(2) EXCEPTION. Paragraph (1) shall not apply with respect to any association or institution described in section 21(f)(4)(F) of the Federal Home Loan Bank Act (as added by section 302 of this title).

Pub.L. 100–86, § 306(h), 101 Stat. 552, 602 (1987). This one-year moratorium on exits from FSLIC was subsequently extended for an additional one-year period. *See*

Pub.L. 100–378, § 10; 102 Stat. 887, 889 (1988).

The exception to the moratorium on exits (§ 306(h)(2)) applied to insured institutions that were exempt from the termination assessment and final insurance premium under 12 U.S.C. § 1441(f)(4)(F). An institution was exempt from the moratorium if, on or before March 31, 1987, the institution had:

(i) its status as an insured institution terminated voluntarily, involuntarily, or by operation of law in connection with a conversion into, merger with, acquisition by, consolidation with, reorganization into, or combination by any means with, reorganization into, or combination by any means with, an institution the deposits of which are insured by the Federal Deposit Insurance Corporation;

(ii) filed an application or notice with any State banking agency or authority, or with the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, the Corporation or the Federal Home Loan Bank Board pursuant to a transaction which, upon the consummation thereof, will result in the termination of the institution's status as an insured institution in connection with its conversion into, merger with, acquisition by, consolidation with, reorganization into, or combination by any means with, an institution the deposits of which are insured by the Federal Deposit Insurance Corporation; or

(iii) entered into a letter of intent or a written memorandum of understanding, pursuant to a transaction which will result in the termination of the institution's status as an insured institution in connection with its conversion into, merger with, acquisition by consolidation with, reorganization into, or combination by any means with, an institution the deposits of which are insured by the Federal Deposit Insurance Corporation.

12 U.S.C. § 1441(f)(4)(F) ("grandfather provision").

Paragraph (iii) of the grandfather provision is the focus of this case because on

March 30, 1987, one day before the grandfather provision's March 31 cut-off date, GW–California entered into a Memorandum of Understanding with Great Western Thrift and Loan, an industrial loan corporation chartered under the laws of Utah whose deposit accounts are insured by the FDIC (now the BIF) (GW–Utah). In this memorandum, GW–California and GW–Utah agreed to combine into a single entity that would change its name to "Great Western Bank" and "obtain deposit insurance from and become a member of the FDIC."

In July, 1987, as part of a separate transaction, GWFC, GW–California's parent, agreed to acquire the Washington State institution that later became appellant GW–Washington. This acquisition was completed in February 1988.

Some time after July, 1987, GW–California decided that a merger with GW–Washington would be preferable to a combination with GW–Utah and on June 7, 1988, entered into a Memorandum of Understanding contemplating the implementation of a Plan of Merger with GW–Washington.

Then, on October 26, 1988, GW–California and GW–Washington submitted applications to the Bank Board pursuant to 12 C.F.R. 552.13, and the FDIC pursuant to then section 5(*o*)(2)(D) of the Home Owners' Loan Act, for permission to merge GW–California into GW–Washington, with the merged entity to be a federally-chartered savings bank insured by the FDIC.[2] Had the merger been granted, GW–California would have left the FSLIC fund, taking its $21 billion in insured deposits with it.

GW–California contends that it decided to pursue a merger with GW–Washington rather than with GW–Utah, with which it had entered into a Memorandum of Understanding prior to the May 31 moratorium exemption cutoff date, in reliance on a March 16, 1988 decision by the Bank Board granting a merger application by the

FSLIC-insured New Hampshire institution, First Federal Savings Bank of Nashua ("First Federal"). In that case, the Bank Board stated that First Federal was exempt from the one-year moratorium on departures from the FSLIC insurance system. First Federal had entered into a letter of intent to merge with an FDIC-insured institution prior to the March 31, 1987 grandfather date, but was requesting to transfer assets to a different institution.

On May 22, 1989, the Bank Board issued a one-page resolution rejecting GW–California's merger application, concluding that it was not "grandfathered from the CEBA Moratorium." Although the resolution does not contain any reasoning, it explicitly incorporates by reference the reasoning contained in two Legal Opinions prepared for that case by the Bank Board's Office of General Counsel. The Legal Opinions determined that GW–California did not fall within the third exception to the exit moratorium (the third grandfather clause, 12 U.S.C. § 1441(f)(4)(F)(iii)), and was therefore prevented from voluntarily leaving the FSLIC insurance fund through a merger into an FDIC insured institution because: (1) GW–California's May 30, 1987 Memorandum of Understanding with GW–Utah pertained to an entirely different transaction involving an entirely different prospective merger partner than the transaction that was the subject of GW–California's merger application; (2) GW–California lacked a present intent to combine with GW–Utah when it allegedly entered into the Memorandum of Understanding with GW–Utah on May 30, 1987; and (3) the May 30 Memorandum of Understanding was not formally executed prior to the March 31, 1987 exemption cutoff date.

In explaining its first reason, that the May 30 Memorandum of Understanding did not relate directly to the merger of GW–California and GW–Utah, the Bank Board distinguished its decision in the *First Federal* case. It stated that the *First Federal*

---

**2.** On that same day, GW–Washington filed applications with the Bank Board and FDIC to convert from a state-chartered savings bank to a federally-chartered savings bank, the accounts of which would remain insured by the FDIC.

GW–Washington also filed an application to become a member of the Federal Home Loan Bank of Seattle, Washington. Both of these applications were granted by the Bank Board.

decision "did not ... establish a precedent for the proposition that a memorandum of understanding need not relate to the specific transaction that will result in the institution's termination of insurance." Rather, it explained that the Board's decision in that case was based on a colloquy among Senators Rudman, Humphrey, Proxmire, and Garn immediately prior to the Senate vote on the Conference version of CEBA regarding First Federal during which Senator Proxmire stated that, in First Federal's case, it would not lose its grandfather rights if it modified its FDIC application to substitute another merger partner. The Bank Board stated that its decision in *First Federal* therefore "represented an attempt ... to comply with the intent of congress to grandfather a specific institution based on the particular facts and circumstances of that case."

Appellants commenced an action in the United States District Court for the Central District of California, alleging that the Bank Board acted arbitrarily and capriciously in refusing to approve the merger application, and seeking declaratory and injunctive relief overturning the Bank Board's action and directing it to approve their merger. The district court consolidated the hearing on appellants' motion for a preliminary injunction with the trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2). In a decision dated July 8, 1989 and filed July 18, 1989, the district court found that the Bank Board's first reason for denying the merger application was proper and that, therefore, the denial was neither arbitrary and capricious nor contrary to law. The court found that the plain language of 12 U.S.C. § 1441(f)(4)(F)(iii) and the legislative history revealed that this exemption from the moratorium applies only to "those institutions that had made a commitment, prior to the deadline of March 31, 1987, to implement the transaction that ultimately results in the institution's exit from the FSLIC system." The district court explicitly made no finding as to the Bank Board's action in the *First Federal* case, stating that "Such does not affect the interpretation of the statute."

GW–California and GW–Washington appeal the district court's order affirming the decision of the Bank Board and denying their request for preliminary injunctive relief.

## II. STANDARD OF REVIEW

"District court review of agency action is generally accorded no particular deference, because the district court, limited to the administrative record, is in no better position to review the agency than the court of appeals." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1161 (9th Cir.1980).

In reviewing agency determinations, review is limited to whether the agency's action was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Sierra Pacific Indus. v. Lyng*, 866 F.2d 1099, 1105 (9th Cir.1989). An agency's interpretation of a statutory provision and regulation it is charged with administering is entitled to a high degree of deference. *Oregon v. Bureau of Land Management*, 876 F.2d 1419, 1425 (9th Cir.1989). Courts, however, "are the final authorities on issues of statutory construction," and "must reject administrative constructions which are contrary to congressional intent." *Id.* (citations omitted).

## III. DISCUSSION

The Office of Thrift Supervision, successor to the Bank Board under FIRREA, and the FDIC as Amicus Curiae, argue that, in reviewing this case, we should apply the law in effect at the time of our decision. *See Bradley v. School Bd. of City of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Thus, they contend that we should apply FIRREA in determining GW–California's right to exit the SAIF fund by merging with GW–Washington, a BIF-insured institution. FIRREA requires the FDIC to approve all conversion transactions (including the type of merger proposed by appellants), 12 U.S.C.A. § 1815(d)(2)(A)(i), and provides that the FDIC may not approve any conversion transaction before the end of the 5–year period beginning on FIRREA's enactment

date, August 9, 1989. 12 U.S.C.A. § 1815(d)(2)(A)(ii). The exceptions to this 5-year moratorium are set out in FIRREA, § 206(a)(7), 103 Stat. 197-98, 12 U.S.C.A. § 1815(d)(2)(C); and FIRREA § 206(b), 103 Stat. 205, 12 U.S.C.A. § 1815 note. Appellants do not refute that their proposed merger does not fall within any of FIRREA's exceptions to the ban on conversion approvals. Thus, the OTS and the FDIC maintain that appellants have no present right to merge and the case should be dismissed.

GW–California and GW–Washington argue, on the other hand, that this case should be governed by the rule that "statutes affecting substantive rights and liabilities are presumed to have only prospective effect" absent clear legislative intent to the contrary. *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985). They contend that their right to merge under the CEBA grandfather clause was wrongfully denied by the Bank Board, and that they may seek review of that wrongful denial from this court.

■ We need not reach the difficult question whether FIRREA, which would concededly bar the proposed merger, should be applied to this pending case, because we find that appellants' proposed merger was properly denied even under CEBA, the law that appellants believe controls. We hold that the Bank Board's decision to deny the proposed merger, because it found GW–California was not grandfathered from the CEBA moratorium, was not arbitrary or capricious.

### A. The Bank Board's Interpretation Of CEBA In This Case Was Reasonable

In denying appellants' application to merge, the Bank Board interpreted section iii of the grandfather provision to require "that the memorandum of understanding entered into relate to the specific transaction that will serve as the means by which the insured institution converts to FDIC insurance." Because the transaction contemplated in the Memorandum of Understanding that was filed on March 30, 1987 was between GW–California and GW–Utah, and the transaction that was the subject of the merger application through which GW–California would convert to FDIC (BIF) insurance is between GW–California and GW–Washington, the Board determined that GW–California did not qualify for grandfathered treatment.

This interpretation and application of CEBA is reasonable, if not mandated, by the language and legislative history of the statute. The express language of 12 U.S.C. § 1441(f)(4)(F)(iii) provides that the exemption applies only where a memorandum of understanding had been executed *"pursuant to a transaction which will result* in the termination of the institution's status as an insured institution" (emphasis added). As the Bank Board points out, the plain meaning of that language is that the transaction contemplated in the memorandum of understanding must be the same transaction through which the institution departs from the FSLIC insurance system. The provision does not state that the memorandum of understanding may relate to a transaction that "may result," or "could result" in exit from the FSLIC system, but rather that *will* result in the exit.

The legislative history of both CEBA and the subsequent one-year extension of the moratorium support this interpretation. Statements by the majority and minority managers of CEBA indicate that the provision was meant to apply to the particular transaction that will result in the departure from FSLIC. Senator Proxmire, Chairman of the Senate Banking Committee, stated that it was Congress' intent in the grandfather provisions

> to except [from the CEBA moratorium] only those institutions that have, by March 31, 1987, formally executed letters of intent or written memorandums of understanding that indicate their present intent to proceed with *the transaction that results in their leaving the FSLIC* for the FDIC.

133 Cong.Rec. S11,210 (daily ed. August 4, 1987) (statement of Sen. Proxmire) (emphasis added). Similarly, Congressman Leach stated that the "third category is intended to include those institutions that formally

executed documents evidencing a decision to proceed *with the transaction that results* in their leaving the FSLIC...." 133 Cong.Rec. H6969 (daily ed. August 3, 1987) (statement of Rep. Leach) (emphasis added); *see also* 133 Cong.Rec. S11,210 (daily ed. August 4, 1987) (statement of Sen. Garn).

■ The legislative history of the CEBA moratorium renewal also makes clear that the grandfather provisions are to be narrowly construed so as not to frustrate the purpose of the moratorium—to prevent the exodus of healthy thrifts from the insurance fund. Senator Proxmire remarked that "extension of the moratorium is critical, essential, to preserve the finances of the Federal Savings and Loan Insurance Corporation. Otherwise, the healthy savings and loans will leave the system...." 134 Cong.Rec. S7856 (daily ed. June 15, 1988) (statement of Sen. Proxmire). And Senator Riegle commented, "I think that it is very important that we extend the moratorium so that solvent savings and loans not bail out of the S & L system and go *over into the FDIC system.*" 134 Cong. Rec. S7858 (daily ed. June 15, 1988) (statement of Sen. Riegle).

Indeed, Congress so narrowed this grandfather provision that in the final conference report, H.R.Conf.Rep. No. 261, 100th Cong., 1st Sess. 158 (1987), U.S.Code Cong. & Admin.News 1987, pp. 489, 627, it deleted from a preliminary report of the House Committee on Banking, Housing and Urban Affairs, dated July 24, 1987, a discussion that stated that any institution whose board of directors had adopted a resolution to leave the FSLIC system prior to the cutoff date was exempted from the moratorium.

Thus, the Bank Board's interpretation of the CEBA grandfather clause iii as not permitting an institution to merge with a different partner than the one contemplated in the memorandum of understanding, is not only reasonable, but is practically mandated by the statute's language and legislative history.

### B. Reliance On The First Federal Decision

Appellants contend, however, that the Bank Board's denial of their merger application was arbitrary and capricious because the Bank Board failed to follow the precedent it allegedly set in the *First Federal* case.

■ Appellants maintain that the *First Federal* decision established a rule, directly applicable to the instant case, that an institution that entered into a memorandum of understanding or letter of intent to merge with an FDIC institution on or before the March 31, 1987 grandfather date could thereafter "change partners" and not lose its grandfather rights. Citing the proposition that "agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departure," *National Conservative Political Action Comm. v. FEC,* 626 F.2d 953, 959 (D.C.Cir.1980), appellants maintain that the Bank Board's decision in the instant case was arbitrary and capricious for failing to apply this rule to a factually indistinguishable case. Appellants argue that this *First Federal* "rule" represents a reasonable reading of CEBA's grandfather clause iii and that therefore, the district court and this court must defer to the *"First Federal* Rule" and find that the Board's departure from this rule was arbitrary. Finally, appellants assert that, although the Board is allowed to change the rule, it must only do so prospectively.[3]

---

**3.** Appellants also contend that the Bank Board has engaged in a pattern "of allowing small institutions to leave FSLIC while imprisoning large institutions within FSLIC despite their legal right to depart," and that this is arbitrary and capricious per se. This contention has no merit.

Appellants point to the fact that the Bank Board approved an application by Shelton Savings & Loan Association of Connecticut ("Shel-

ton") to withdraw from FSLIC pursuant to subsection (iii) of the grandfather provision—the same subsection relied on by appellants—even though Shelton had not entered into a letter of intent or memorandum of understanding prior to the grandfather date, but rather, had merely had its board of directors approve a plan of conversion. Appellants appear to maintain that a liberal interpretation was given the grandfather clause in the Shelton case because Shelton

Appellants' contentions fail for one main reason. We do not interpret the *First Federal* decision as establishing the broad "binding rule" that appellants attribute to it. The Bank Board's resolution granting First Federal's application to merge with an FDIC institution stated only that First Federal "is not subject to the one-year moratorium on departures from the FSLIC insurance system imposed by the [CEBA]." It did not contain the reasoning used to reach that decision. However, as revealed by the Federal Reserve Board in its separate approval of the merger, *see* Fed.Res. Bull., June 1988 at 388, and by the Bank Board's General Counsel in its legal memoranda for the instant case, the Bank Board based its decision in First Federal on a specific statement of "Congressional intent" regarding First Federal by Senator Proxmire during a colloquy with Senators Rudman, Humphrey, and Garn in August, 1987, immediately prior to the Senate vote on the conference version of CEBA. Senator Humphrey of New Hampshire described in an inquiry the circumstances of a specific transaction that involved First Federal:

> Mr. HUMPHREY. If a savings and loan institution signed a letter of intent with a bank providing for the merger of the two institutions on March 19, 1987, then filed an application with the [FDIC] for insurance of accounts in connection with the proposed merger transaction on April 23, 1987, would this institution qualify for the exemption under section 21(f)(4)(F)(iii), notwithstanding the fact that the proposed merger subsequently fell through in June of 1987, if this institution pursues FDIC insurance by modifying its FDIC application?
>
> Mr. PROXMIRE. Yes, it would qualify since the letter of intent was entered into on March 19, 1987, before the March 31 grandfather date, and as part of the process initiated by that letter the institution will change its insurance status to FDIC-insured. Thus grandfather status attaches despite the fact that the original merger transaction was not consummated as announced in June 1987, since the April 23 application to change insurance stems from the March 19 date. *But this only applies since the April 23 application to the FDIC, under which the conversion will occur, was filed before the date of enactment of this bill. Thus, if conversion does not proceed under the April 23 application—as may be modified with the approval of the FDIC—the institution will lose its grandfather rights.*

133 Cong.Rec. S11,213–14 (daily ed. August 4, 1987) (emphasis added).

Senator Proxmire's statement, on which the Bank Board based its approval of First Federal's merger application, certainly does not announce a general rule that all institutions may change partners and still retain grandfather rights. It seems to assume that grandfather status would be *lost unless* the FDIC application was filed *before* the bill's enactment date and before the

---

is a small institution with only about $100 million in deposits, while a narrow construction was given to the grandfather clause in this case because GW–California is large, with about $21 billion in deposits.

However, the Bank Board approved Shelton's application because of a statement in the House Conference Report on CEBA that it was the intent of the conferees that Shelton would qualify for exemption under subsection iii. *See* H.R. Conf.Rep. No. 261, 100th Cong., 1st Sess, *reprinted in* 1987 U.S.Code Cong. & Admin.News 588, 627. In a different case, involving similar facts but an even smaller institution than Shelton, First City Federal Savings Bank of Memphis, Tennessee, the Bank Board *denied* grandfather status based on the same provision because there was no specific statement in the legislative history as to First City, and passing a

resolution to convey prior to the grandfather date does not rise to the level of an officially executed letter of intent or memorandum of understanding required by the grandfather provision. In that case, then, the Bank Board applied a strict construction and denied exit where a *small* institution was involved.

In addition, the Bank Board points out that on August 1, 1989, it approved exemption from the moratorium of one of the largest associations in the then-FSLIC system, Home Federal Savings & Loan Association of San Diego, California.

Therefore, the record before us does not support the contention that the Bank Board arbitrarily and capriciously considered applications for grandfather treatment according to the wealth of the institution.

decision to change partners, and the FDIC allowed the application to be modified. Therefore, the only arguable rule or precedent to be derived from the *First Federal* decision, is that the Bank Board will look to specific statements by individual members of Congress if applicable to a particular institution's application, or that grandfather rights will be extended to an institution that fits the *precise facts* of the *First Federal* case. Neither of these "precedents" applies to GW–California. GW–California points to nothing in the legislative history that relates to it on the issue of grandfather status, and would not qualify for the "Proxmire exemption" because GW–California did not apply for FDIC insurance either prior to the enactment date or prior to the change in merger partners.

Appellants are certainly correct in pointing out that Senator Proxmire's analysis that First Federal would be exempt because of the status of its FDIC application makes no sense in relation to the statutory language.[4] Counsel for the Bank Board admitted at oral argument before the district court that it tried to adopt Senator Proxmire's analysis in the *First Federal* case but that "looking at it now ... I don't understand the analysis that he proposed." The counsel also confessed that in *First Federal* (and in *Shelton* ) "the Bank Board accepted the statements of senators and the conferees as being the proper interpretation of the statute and didn't conduct ... an adequate analysis of the statute itself."

While the Bank Board may have wrongly decided *First Federal* based on a flawed interpretation of the statute by Senator Proxmire, and while it shirked its duty in not fully analyzing the statute in that case, it seems clear that it did not announce or even imply the *general* rule that appellants attribute to the *First Federal* case and on which appellants contend they have a right to rely. Therefore, appellants' contention that the Bank Board's decision is arbitrary and capricious because it failed to follow its own "binding rule" is meritless. The Bank Board rejected appellants' merger application pursuant to the only relevant rule in this case: CEBA's statutory language itself.[5]

Even if, for the sake of argument, we were to accept appellants' contentions that the Bank Board, in the *First Federal* case, effectively held that institutions could "switch partners" and still be exempt from the CEBA moratorium, and that the Bank Board changed its rule in considering appellants application, we would still reject appellants' claims that we should defer to the "First Federal Rule," and that this "new rule" should only be applied prospectively.

Although the interpretation put on the statute by the agency charged with administering it is entitled to deference, *Federal Election Comm. v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31, 102 S.Ct. 38, 41, 70 L.Ed.2d 23 (1981), courts "must reject administrative constructions of the statute ... that frustrate the policy that Congress sought to implement." *Id.* at 32, 102 S.Ct. at 41. We believe that the purported *First Federal* rule would frustrate Congress' policy in CEBA to keep thrifts temporarily within the FSLIC system. An agency need not adhere to a precedent that is inconsistent with the statute; indeed, the agency has a duty to reverse itself when it finds that its previous interpretation of the statute was unreasonable or unlawful. A person is never enti-

---

**4.** Senator Proxmire seems to have been confusing subsections (ii) and (iii) of the grandfather provision, and the relevance of the enactment date versus the grandfather date. Under subsection (ii) an institution could obtain an exemption from the CEBA moratorium if it filed an application with the FDIC on or prior to the *grandfather* date, March 31, 1987, *not* the enactment date. In addition, subsection (iii), on which appellant and First Federal relied, makes no mention of the need to file with the FDIC by any particular date, only to enter into a letter of intent or memorandum of understanding by March 31, 1987.

**5.** Appellants are certainly correct in arguing that *First Federal* and the instant case are difficult to distinguish for statutory purposes. The differences between the two *are* relevant, however, when it comes to considering the scope of *First Federal,* which is what we must do here. Although it was wrongly decided, *First Federal* clearly was limited to the specific facts of that case.

tled to avoid the effects of retroactivity by relying on a precedent that, because based on an impermissible construction of the statute, could not withstand judicial review.

Appellants contend that the *"First Federal* rule" does represent a reasonable interpretation of the grandfather provision because Congress, in enacting the moratorium, eliminated a FSLIC-insured institution's "unfettered" right to leave the FSLIC fund, and thus intended that the grandfather clause "be given a liberal interpretation so as to permit institutions a meaningful opportunity to take advantage of what was to become, in effect, their last chance to leave the FSLIC system." Appellants argue that by allowing such a preliminary document as a memorandum of understanding to exempt an institution from the moratorium, Congress meant to provide a high degree of flexibility to those institutions seeking to exempt themselves.

These contentions are undermined by several factors. First, as explained above, the statutory language and legislative history appear to mandate the interpretation applied by the Bank Board in this case, that institutions may *not* switch merger partners.

Second, Congress chose a cutoff date for the grandfather provisions that was not made public until after it had passed. On March 31, 1987, the House Subcommittee on Financial Institutions, Supervision, Regulation and Insurance issued a subcommittee print of the bill which for the first time contained the grandfather provisions and a March 30, 1987 cutoff date. Therefore, Congress did not intend to give institutions a "meaningful opportunity" to exit the fund.[6]

Rather, Congress, intended to allow institutions to follow through with transactions already "in the works." For example, prior to the passage of the moratorium renewal, Senator Garn stated: "Last year we halted the exodus from FSLIC, but recognized that it would be unfair to apply the restriction to particular institutions that

had already spent considerable time and money on transactions involving insurance conversions." 134 Cong.Rec. S17,024 (daily ed. October 20, 1988) (statement of Sen. Garn).

Third, the Bank Board's decision in *First Federal* is not based on the "meaningful opportunity" rationale appellants now urge. Rather, the exclusive basis for its decision seems to be a piece of legislative "history" that anyone but the most naive could recognize as a product manufactured by a senator as part of an effort to give advantage to a constituent.

Finally, we find persuasive the Bank Board's argument that GW–California's "technical compliance" interpretation, that the memorandum of understanding need not relate to the same transaction through which an institution leaves the FSLIC fund, would produce results inconsistent with the Congressional scheme. In its brief, the Bank Board states: "Under that interpretation, any savings association that was lucky enough to have maintained in its files a memorandum of understanding which was executed at any time prior to the CEBA [grandfather] date—even 20 years earlier with an institution that no longer exists—could then rely upon that document, which was in arguable 'technical compliance' with the words of the exemption provision, to permit exit from the FSLIC fund." Therefore, we would not defer to such an interpretation.

■ The final issue to consider is whether, assuming arguendo that *First Federal* had indeed established a rule pertinent to the case at hand, the proposed "new rule" should only be applied prospectively. While we agree that retroactive application generally is not favored, we find little difficulty in allowing it in this case. Our court has adopted a five-part analysis to address this question. *See Montgomery Ward & Co. v. FTC,* 691 F.2d 1322, 1333 (9th Cir. 1982); *see also Oil, Chemical and Atomic*

**6.** Congress did add a day to the cut-off date by setting an "on or before March 31" deadline in the statute as enacted. Therefore, institutions

that had not received information prematurely, had one day in which to scramble to fit within the grandfather clause.

*Workers Int'l Union, Local 1-547 v. NLRB*, 842 F.2d 1141, 1145 (9th Cir.1988).[7]

In considering the relevant factors, two elements weigh decisively in favor of the Bank Board. To begin with, the *First Federal* decision, an informal adjudication without clearly articulated reasoning, does not constitute a well-established practice on which GW–California could justifiably rely. *See NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir.1966) (stating that prospective application is ordinarily required where "an agency alters an established rule ... which has been generally recognized and relied on throughout the industry that it regulates").

Appellants contend that the Fifth Circuit in *McDonald v. Watt*, 653 F.2d 1035, 1045 (5th Cir.1981), denied retroactive application of a new interpretation of a rule where the former interpretation had only been applied on two occasions. However, our reading of that case reveals that the former interpretation was followed for over four years by the Bureau of Land Management. *See McDonald*, 653 F.2d at 1044–45.

The second major element in our eyes is the strong interest in applying a rule that corresponds to the plain language of the statute, as was discussed more fully above.

## IV. CONCLUSION

In sum, we believe that the Bank Board's decision to deny appellants' merger application because GW–California was not "grandfathered from the CEBA Moratorium" was not arbitrary or capricious.

AFFIRMED.

---

**7.** The factors to be considered are: (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard. *Montgomery Ward & Co.*, 691 F.2d at 1333 (*citing Retail, Wholesale and Department Store Union v. NLRB*, 466 F.2d 380, 390 (D.C.Cir.1972)).