172 F.3d 317
 BRANCH BANKING & TRUST COMPANY, a bank chartered under the
laws of North Carolina; Branch Banking & Trust Company of
South Carolina, a bank chartered under the laws of South
Carolina, Plaintiffs-Appellants,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, an agency of the
United States of America, Defendant-Appellee.
 No. 98-1558.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 26, 1999.
Decided April 5, 1999.
 
 ARGUED: Joel G. Chefitz, Katten, Muchin & Zavis, Chicago, Illinois, for Appellants. Barbara Reesa Sarshik, Federal Deposit Insurance Corporation, Washington, D.C., for Appellee. ON BRIEF: Robert K. Niewijk, Katten, Muchin & Zavis, Chicago, Illinois; J. Robert Elster, Richard S. Gottlieb, Kilpatrick Stockton, L.L.P., Winston-Salem, North Carolina, for Appellants. Ann S. DuRoss, Assistant General, Robert D. McGillicuddy, Senior Counsel, Jaclyn C. Taner, Federal Deposit Insurance Corporation, Washington, D.C., for Appellee.
 Before WIDENER, MURNAGHAN, and HAMILTON, Circuit Judges.
 Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge WIDENER and Judge MURNAGHAN joined.
 OPINION
 HAMILTON, Circuit Judge:
 
 
 1
 The Oakar Amendment to the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 183 (1989) (FIRREA), as amended by the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102-242, 105 Stat. 2236 (1991) (FDICIA), was enacted as an exception to a FIRREA moratorium prohibiting certain "conversion transactions" between Saving Association Insurance Fund (SAIF) member[1] institutions and Bank Insurance Fund (BIF) member[2] institutions.[3] The Oakar Amendment permits the FDIC to approve specified conversion transactions between BIF member institutions and SAIF member institutions without any deposit insurance fund exit or entrance fees, as long as the resulting institution, called an "Oakar institution," pays deposit insurance premiums to BIF and SAIF according to the relative portions of BIF-insured deposits and SAIF-insured deposits at the time of the conversion transaction, adjusted for subsequently acquired deposits. See 12 U.S.C. § 1815(d)(3). If the resulting Oakar institution's primary insurance fund[4] is BIF and its secondary insurance fund[5] is SAIF, it is a "BIF Oakar institution."
 
 
 2
 In this case, the Appellants, Branch Banking & Trust Company, headquartered in North Carolina (BB & T-NC) and Branch Banking & Trust Company of South Carolina (BB & T-SC), two BIF member institutions that paid deposit insurance premiums to BIF, each merged with a BIF Oakar institution that paid deposit insurance premiums to BIF and SAIF.[6] Following the mergers, BB & T asked the Federal Deposit Insurance Corporation (FDIC) to relieve it from paying deposit insurance premiums to SAIF. The FDIC rejected BB & T's request, reasoning that mergers between a BIF member institution and a BIF Oakar institution fell within the ambit of the Oakar Amendment's covered conversion transactions, and finding BB & T, as a resulting institution of such a covered conversion transaction, was required to pay deposit insurance premiums to both SAIF and BIF. BB & T filed suit for declaratory relief, see 5 U.S.C. § 701; 28 U.S.C. §§ 2201, 2202, and the FDIC moved to dismiss the suit pursuant to Federal Rule of Civil Procedure 12(b)(6). In granting the FDIC's motion to dismiss, the district court deferred to the FDIC's interpretive rule pertaining to the deposit insurance premiums owed by BB & T, see Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), because it found that the language of the Oakar Amendment does not specifically address whether an institution resulting from the merger of a BIF Oakar institution and a BIF member institution must pay deposit insurance premiums to BIF and SAIF, and because the FDIC's relevant interpretative rule was permissible in light of the language and underlying purpose of FIRREA. For the reasons stated below, we affirm the judgment of the district court.
 
 
 3
 * Before we address BB & T's challenge to the district court's grant of the FDIC's motion to dismiss for failure to state a claim, see Federal Rule of Civil Procedure 12(b)(6), we set forth some background information on FIRREA and the Oakar Amendment. Beginning in 1934, the Federal Savings and Loan Insurance Corporation (FSLIC) insured "the deposit accounts of federal savings and loan associations, federal savings banks not insured by the FDIC, and certain qualified state chartered thrifts." Great Western Bank v. Office of Thrift Supervision, 916 F.2d 1421, 1423 (9th Cir.1990). However, during the 1980s hundreds of FSLIC-insured "institutions ... failed because of changing economic conditions, mismanagement, and fraud." Id. "As a result, FSLIC paid out billions of dollars to cover insured deposits at the failed institutions and incurred additional liabilities because it had to close hundreds of problem [institutions], leaving the insurance fund insolvent by billions of dollars." Id. Thus, in an attempt to recapitalize the depleted FSLIC, Congress enacted the Competitive Equality Banking Act of 1987 (CEBA), Pub.L. No. 100-86, 101 Stat. 552. See Great Western Bank, 916 F.2d at 1424. Because Congress determined that the recapitalization of FSLIC would be jeopardized if healthy FSLIC-insured institutions were allowed to change their status from FSLIC-insured to FDIC-insured, Congress in the CEBA imposed a moratorium, prohibiting the exit of FSLIC-insured institutions from the FSLIC insurance fund and imposing exit fees on FSLIC-insured institutions leaving after the expiration of the moratorium. See Pub.L. No. 100-86 § 306(h),(h)(2), 101 Stat. 602 (1987), amended by Pub.L. No. 101-378 § 10,102 Stat. 887, 889 (1988) (codified as amended, 12 U.S.C. § 1730 note (1988)); see also Great Western Bank, 916 F.2d at 1424. However, the funds to recapitalize FSLIC provided by the CEBA proved to be insufficient, and, therefore, Congress enacted FIRREA in 1989 and FDICIA in 1991. See Tillman v. Resolution Trust Corp., 37 F.3d 1032, 1035 (4th Cir.1994).
 
 
 4
 FIRREA was "an emergency measure" enacted by Congress to save the failing FSLIC-insured institutions. Id. at 1035. In an effort to restore strength to the failing FSLIC-insured institutions, Congress in FIRREA provided for increased federal supervision and enforcement power over savings associations, an expedited resolution and liquidation process of insolvent savings associations, the regulation of the deposit insurance premiums of savings associations, and the creation of a stable rate of deposit insurance premiums for savings associations. See Great Western Bank, 916 F.2d at 1423 n. 1. Specifically, FIRREA, among other things, abolished the FSLIC and shifted the FSLIC's deposit insurance functions to the FDIC. Id. FIRREA also "established two separate deposit insurance funds to be managed by the FDIC--the Bank Insurance Fund (BIF), to cover the deposits of commercial banks, and the Savings Association Insurance Fund (SAIF), to cover the deposits of savings and loan associations." Id. In an effort to ensure the strength of SAIF, FIRREA imposed higher deposit premiums on SAIF member institutions than BIF member institutions and imposed a higher degree of supervision on SAIF member institutions than BIF member institutions. See generally 12 U.S.C. § 1817.
 
 
 5
 Because Congress anticipated that SAIF member institutions would want to convert to BIF member institutions in order to escape the higher SAIF deposit insurance premiums and the higher SAIF regulation costs, Congress implemented several control measures to prevent an exodus from SAIF. See 12 U.S.C. § 1815(d)(2)(E), (F). First, Congress established temporary entrance and exit fees to be paid to the respective funds when there was a conversion transaction between a BIF member institution and a SAIF member institution. See 12 U.S.C. § 1815(d)(2)(E). To discourage SAIF member institutions from converting to BIF member institutions, Congress set a higher exit fee on institutions leaving SAIF for BIF. See 12 U.S.C. § 1815(d)(2)(F). Second, Congress essentially replaced the expired CEBA moratorium with a five-year moratorium in FIRREA beginning on August 9, 1989.[7] See 12 U.S.C. § 1815(d)(2)(A)(ii). During the moratorium imposed by FIRREA, the FDIC, except in certain circumstances, limited the ability of SAIF member institutions to convert to BIF member institutions by prohibiting certain "conversion transactions" that would result in the conversion of an institution's deposits from SAIF to BIF;[8] thus the moratorium essentially ensured mandatory SAIF membership for federal savings associations until its expiration. See id.
 
 
 6
 During the FIRREA moratorium, the FDIC was authorized to approve only conversion transactions from one deposit insurance fund to the other insurance fund that met an exception to the moratorium. The moratorium authorized the approval of the following conversion transactions: (1) conversion transactions that affected an "insubstantial portion" of the total deposits of each depository institution, or (2) certain specified supervisory conversion transactions involving a SAIF member institution or a BIF member institution in default or in danger of default. See 12 U.S.C. § 1815(d)(2)(C). Each depository institution participating in such a transaction was required to pay entrance and exit fees. See 12 U.S.C. § 1815(d)(2)(D).
 
 
 7
 Additional exceptions other than those listed in the moratorium authorized conversion transactions between BIF member institutions and SAIF member institutions. See 12 U.S.C. § 1815(d)(2)(G) (authorizing charter conversions); 12 U.S.C. § 1815(d)(3)(A) (authorizing conversions through merger). In effect, these exceptions allowed SAIF member institutions to convert to BIF member institutions, provided the resulting institution continued to pay deposit insurance premiums to SAIF. See 12 U.S.C. § 1815(d)(2)(G); 12 U.S.C. § 1815(d)(3)(B). One such exception was enacted in the Oakar Amendment to FIRREA, as amended by Section 501 of FDICIA. See 12 U.S.C. § 1815(d)(3). Of relevance, the Oakar Amendment permitted, provided certain circumstances were met, the FDIC to approve the following conversion transactions between a SAIF member institution and a BIF member institution without paying entrance or exit fees:
 
 
 8
 the merger or consolidation of a [BIF] member with a [SAIF] member;
 
 
 9
 the assumption of any liability by--
 
 
 10
 (I) any [BIF] member to pay any deposits of a [SAIF] member; or
 
 
 11
 (II) any [SAIF] member to pay any deposits of a [BIF] member; [or]
 
 
 12
 the transfer of assets of--
 
 
 13
 (I) any [BIF] member to any [SAIF] member in consideration of the assumption of liabilities for any portion of the deposits of such BIF member; or
 
 
 14
 (II) any [SAIF] member to any [BIF] member in consideration of the assumption of liabilities for any portion of the deposits of such [SAIF] member, 12 U.S.C. §§ 1815(ii)-(iv) (Oakar conversion transaction).
 
 
 15
 See 12 U.S.C. § 1815(d)(3)(A). However, the Oakar Amendment did not authorize any conversions resulting in the complete shifting of deposits from SAIF to BIF:
 
 
 16
 This paragraph shall not be construed as authorizing transactions which result in the transfer of any insured depository institution's Federal deposit insurance from [one] Federal deposit insurance fund to the other Federal deposit insurance fund.
 
 
 17
 12 U.S.C. § 1815(d)(3)(E)(ii).[9] In fact, after an Oakar conversion transaction, the assuming, acquiring, or resulting institution (Oakar institution) had to allocate its deposit base between SAIF and BIF. See 12 U.S.C. § 1815(d)(3)(B). Specifically, a BIF Oakar institution had to pay deposit insurance premiums to its primary fund, BIF, and its secondary fund, SAIF. See id. The amount of deposits the BIF Oakar institution paid to its secondary fund, SAIF, was equal to its "adjusted attributable deposit amount" (AADA).[10] See § 1815(d)(3)(B)-(C). In effect, a BIF Oakar institution had to pay deposit insurance premiums to BIF and SAIF according to the relative portions of BIF-insured deposits and SAIF-insured deposits at the time of the conversion transaction, adjusted for subsequently acquired deposits. See 12 U.S.C. § 1815(d)(3)(B), (D).
 
 
 18
 Following the enactment of the Oakar Amendment, questions arose concerning Oakar institutions. Specifically, the FDIC was asked to express its
 
 
 19
 position on the proper treatment, under the FDIC's assessment rules and the rules governing conversion fees, of a transaction whereby [a BIF] "Oakar bank"--i.e., a bank that has acquired a savings association under the so-called "Oakar Amendment," 12 U.S.C. § 1815(d)(3)--subsequently transfers some of its deposits to another bank insured by the Bank Insurance Fund ("BIF").
 
 
 20
 FDIC Advisory Op. 90-11 (June 15, 1990). In response, the FDIC stated its position in an Interpretive Letter known as the Rankin Letter. Id. Specifically, in the Rankin Letter, the FDIC, viewing an Oakar institution as an institution that belongs to a primary insurance fund but holds deposits that are treated as insured by a secondary insurance fund, adopted the principle "that an Oakar institution transfers its primary-fund deposits first, and only transfers its secondary-fund deposits after its primary-fund deposits have been exhausted." 61 Fed.Reg. 64,960, 64,962 (interpreting the Rankin Letter). In other words, a BIF Oakar institution, which belongs to BIF, its primary fund, but holds deposits that are treated as insured by SAIF, its secondary fund, transfers its primary BIF funds first and only transfers its secondary SAIF funds after its primary BIF fund deposits are exhausted. See id. The FDIC advised that whether the deposit transfer from a BIF Oakar institution to a BIF member institution would be treated as an Oakar conversion transaction would depend upon whether the total amount of deposits being transferred would reduce the BIF Oakar institution's total deposit base below that amount of its AADA. See FDIC Advisory Op. 90-11 (June 15, 1990) (Rankin Letter).[11] The FDIC stated that if a BIF Oakar institution transferred and exhausted its primary BIF fund deposits and then transferred its secondary SAIF fund deposits to a BIF institution, the transaction would be a covered Oakar conversion transaction. See id.
 
 
 21
 Thereafter, in 1996, the FDIC proposed amending its assessment regulations by adopting interpretative rules codifying the FDIC's methodology, set forth in the Rankin Letter, of attributing deposits to BIF and SAIF when a BIF Oakar institution was acquired by a BIF member institution. See 61 Fed. Reg. 34,751; see also 12 U.S.C. § 1819 (authorizing the FDIC to promulgate "such rules and regulations as it may deem necessary to carry out the provisions of ... any law which it has the responsibility of administering or enforcing ..."). Following the required notice and comment period, because "[n]either section 5(d)(2) nor the Oakar Amendment explicitly addresses the case of an Oakar institution that transfers deposits to another institution," the FDIC published a final regulation on December 10, 1996, adopting interpretive rules codifying the FDIC's position, as expressed in the Rankin Letter, regarding deposit transfers by BIF Oakar institutions to BIF member banks. 61 Fed.Reg. 64,960,64,962 (1996). The FDIC stated that it had considered the submitted comments on the Rankin Letter and alternative approaches, but it had determined that the methodology set forth in the Rankin Letter was preferable because the approach was simple, "well established and well understood," and consistent with the structure and purpose underlying the Oakar Amendment. Id. at 64,962-63. The FDIC stated:
 
 
 22
 ... The FDIC considers that it has ... ample authority to prescribe a method for attributing deposits that an Oakar institution transfers to another institution. The contrary view would render section 5(d)(2) and the Oakar Amendment meaningless. If the FDIC has no such power, a BIF-member buyer could acquire deposits from a SAIF-member seller without paying entrance and exit fees simply by passing the deposits through an intermediary BIF-member Oakar bank. The barrier between the insurance funds would effectively disappear. Moreover, the acquired deposits would be neither SAIF-assessed nor SAIF-insured: contrary to Congress' intent the private capital of the banking system would not help to bolster the SAIF. See 135 Cong. Rec. H4970 (Aug. 3, 1989) (statement of Rep. Oakar).
 
 
 23
 Id. at 64,962. The FDIC then explained the reasoning behind its conclusion that, subsequent to a conversion transaction between a BIF Oakar institution and a BIF institution that fell under the ambit of the Oakar Amendment, the resulting institution is obligated to pay deposit insurance premiums to SAIF:
 
 
 24
 The FDIC accepts the proposition that an Oakar institution is a member of its primary fund only, and is not a member of its secondary fund even though it holds secondary-fund deposits....
 
 
 25
 But the FDIC also takes the position that nominal fund membership is not the touchstone for determining whether a transaction is a conversion transaction within the meaning of section 5(d)(2), and accordingly does not determine whether a transaction comes within the scope of the Oakar Amendment. "Membership" is a label that denotes the formal relationship of an insured institution to the FDIC as insurer within the context of the two-fund membership....
 
 
 26
 But membership does not correctly express the relationship between Oakar institutions and the FDIC as insurer. Oakar institutions owe assessments to both funds, and both funds must share the loss that the FDIC would suffer if an Oakar institution were to fail.
 
 
 27
 The FDIC resolves these conflicting themes by focusing on the relationship of an Oakar institution to the FDIC--the set of obligations that the label "BIF member" or "SAIF member" ordinarily signifies--and not on nominal fund membership. The FDIC takes the position that the substance of the relationship, and the effect of a deposit-transfer is a conversion transaction within the meaning of section 5(d)(2). Put another way, the FDIC considers that the label "member" must be given only that degree of significance that is appropriate to preserve the integrity of the two-fund system.
 
 
 28
 Id. at 64,962-63.
 
 
 29
 The FDIC's final regulation adopting interpretive rules pertaining to when deposit transfers by BIF Oakar institutions to BIF member institutions fall within the ambit of the Oakar Amendment has been codified in the Code of Federal Regulations. See 12 C.F.R. § 327 (1997). Of relevance, 12 C.F.R. § 327.37(a)(2) in effect provides that if a BIF institution merges with a BIF Oakar institution and in the merger the BIF Oakar institution transfers and exhausts its primary BIF fund deposits and then transfers its secondary SAIF fund deposits to the BIF institution, the transferred SAIF funds are deemed to be insured by SAIF; therefore, the transaction is a covered Oakar conversion transaction.[12] After such a transaction, "[t]he deposits [held by the resulting institution] shall be deemed ... to be insured by the same fund or funds in the same amount or amounts as the deposits were so insured immediately prior to the transaction."
 
 II
 
 30
 The facts in this case are undisputed. BB & T-NC and BB & T-SC were BIF member institutions, institutions paying deposit insurance premiums to BIF. On May 26, 1995, during the FIRREA moratorium prohibiting certain conversion transactions, BB & T-NC acquired by merger Southern National Bank of North Carolina (SNB-NC), and BB & T-SC acquired by merger Southern National Bank of South Carolina (SNB-SC). Prior to the mergers, both SNB-NC and SNB-SC, were "Oakar institutions," institutions resulting from a prior merger between a BIF member institution and a SAIF member institution. As Oakar institutions, SNB-NC and SNB-SC were required to pay deposit insurance premiums to BIF and SAIF, according to the relative portions of BIF-insured deposits and SAIF-insured deposits at the time of the relevant merger, adjusted for subsequently acquired deposits. SNB-SC and SNB-NC's primary insurance fund was BIF and their secondary insurance fund was SAIF, and, therefore, they were both "BIF Oakar institutions."
 
 
 31
 Following the merger of BB & T-NC with SNB-NC and the merger of BB & T-SC with SNB-SC, BB & T asked the FDIC to reconsider its liability to SAIF. BB & T contended that it was not liable to pay deposit insurance premiums to SAIF because SNB-NC and SNB-SC, as BIF Oakar institutions, were solely BIF members and not members of SAIF, even though they held deposits that were treated as SAIF insured. Thus, according to BB & T, the merger of BB & T-NC with SNB-NC and the merger of BB & T-SC with SNB-SC were merely mergers of BIF member institutions, and consequently were not conversion transactions as defined by the Oakar Amendment. Hence, BB & T maintained that it did not owe assessments to SAIF.
 
 
 32
 On January 29, 1997, the FDIC denied BB & T's request to relieve it from liability to pay deposit insurance premiums to SAIF. The FDIC determined that to allow a BIF institution to acquire a BIF Oakar institution and then not pay deposit insurance premiums to SAIF would conflict with the FDIC's interpretation of the Oakar Amendment. Specifically, the FDIC stated:
 
 
 33
 Since 1989, Congress has imposed and maintained restrictions on the conversion of deposits from one fund to another.... It is clear that Congress sought, by these measures, to carefully control the conversion of deposits from one fund to another in order to preserve the viability and integrity of the insurance funds.
 
 
 34
 ... If a BIF member institution could acquire SAIF assessable deposits from an Oakar [i]nstitution and have those deposits treated as BIF insured without FDIC approval and without paying entrance and exit fees, the system of controls and protections established by Congress to preserve the insurance funds would be nullified. [This] principle embodied in the Rankin [L]etter is a long standing interpretation that has been consistently applied since 1990 and has recently been incorporated in a final rule amending the FDIC's assessment regulations.
 
 
 35
 Consistent with that principle, SAIF-assessable deposits held by an Oakar institution prior to a merger continue ... to be assessable by the SAIF after the merger. Consequently, the SAIF-assessable deposits acquired by BB & TSC when it merged with SNB continue to be subject to assessment by the SAIF.
 
 
 36
 (J.A. 26-27).
 
 
 37
 Thereafter, on March 28, 1997, BB & T filed this action against the FDIC in the United States District Court for the Middle District of North Carolina, seeking declaratory relief that BB & T was not required to pay deposit insurance premiums to SAIF. See 5 U.S.C. § 701; 28 U.S.C. §§ 2201, 2202. The FDIC moved to dismiss the action pursuant to Federal Rule of Civil Procedure 12(b)(6). BB & T then moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The district court granted the FDIC's motion to dismiss, denied BB & T's motion for summary judgment, and entered judgment in favor of the FDIC. In granting the FDIC's motion to dismiss, the district court reviewed the FDIC's interpretation of the Oakar Amendment, as requiring a BIF member institution that merges with a BIF Oakar institution to pay deposit insurance premiums to SAIF, under the two-step process set forth by the Supreme Court in Chevron. The district court first concluded that the Oakar Amendment did not address the specific issue of whether a BIF member institution that acquires a BIF Oakar institution must pay deposit insurance premiums to SAIF. In light of this ambiguity, the district court then examined whether the FDIC's interpretation of this issue was based upon a permissible construction of FIRREA and the Oakar Amendment and concluded that the FDIC's interpretation was indeed consistent with the language and the purpose of FIRREA and the Oakar Amendment. Accordingly, the district court deferred to the FDIC's interpretation that BB & T was required to pay deposit insurance premiums to SAIF and dismissed BB & T's action pursuant to Federal Rule of Civil Procedure 12(b)(6). BB & T timely appeals.
 
 III
 
 38
 On appeal, BB & T contends that the district court erred in dismissing its action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, BB & T avers that the district court's deference under Chevron to the FDIC's interpretation of the Oakar Amendment as requiring BIF institutions, such as BB & T-NC and BB & T-SC, that merge with BIF Oakar institutions, such as SNB-NC and SNB-SC, respectively, to pay deposit insurance premiums to SAIF was error, because, according to BB & T, the plain language of the Oakar Amendment excludes the resulting institution, such as BB & T, in such a conversion from the ambit of the Oakar Amendment.
 
 
 39
 We review the district court's dismissal of a claim under Federal Rule of Civil Procedure 12(b)(6) de novo. See Flood v. New Hanover County, 125 F.3d 249, 251 (4th Cir.1997). The familiar standard for assessing the validity of an agency's interpretation of a statute appears in Chevron. 467 U.S. at 842-43, 104 S.Ct. 2778. In Chevron, the Supreme Court set forth a two-step process to guide judicial review of an agency's interpretation of a statute. First, we determine whether the plain language of the statute directly addresses the precise issue before us. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43, 104 S.Ct. 2778; see also United States v. Jefferson-Pilot Life Ins. Co., 49 F.3d 1020, 1022 (4th Cir.1995). Second, if the statute is silent or ambiguous in expressing Congress' intent, we must determine whether the agency's interpretation is based on a "permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778; see also Jefferson-Pilot, 49 F.3d at 1022. In determining whether a statute is ambiguous, we are guided "by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." United States v. Wildes, 120 F.3d 468, 469-70 (4th Cir.1997), cert. denied sub nom. Cameron v. United States, --- U.S. ----, 118 S.Ct. 885, 139 L.Ed.2d 873 (1998).
 
 
 40
 Therefore, in deciding the degree of deference we owe to the FDIC's interpretation of the Oakar Amendment, we begin by examining the Oakar Amendment to determine whether in it Congress expressly addressed the precise issue before us: whether a transaction whereby a BIF member institution merges with a BIF Oakar institution (an Oakar institution that is a member of BIF, its primary fund, but that holds deposits that are treated as insured by SAIF, its secondary insurance fund) is a "conversion transaction" under the Oakar Amendment such that the acquiring institution is required to pay insurance to both BIF and SAIF in accordance with the deposits being insured or treated as insured by each fund at the time of the acquisition. Neither party contends that Congress expressly addressed this precise issue in the plain language of the Oakar Amendment.
 
 
 41
 BB & T contends, however, that Congress unambiguously expressed its intent in the Oakar Amendment that a transaction between a BIF member institution and a BIF Oakar institution was not a "conversion transaction" under the Oakar Amendment. According to BB & T, the Oakar Amendment expressly defines the "conversion transactions" that result in the "acquiring, assuming, or resulting depository institution" paying deposit premiums to BIF and SAIF, as certain transactions between BIF member institutions and SAIF member institutions. See 12 U.S.C. § 1815(d)(3)(A). BB & T avers that, by definition, a BIF Oakar institution is not a SAIF member institution because while a BIF Oakar institution holds deposits that are "treated as deposits which are insured by [SAIF]," 12 U.S.C. § 1815(d)(3)(B)(i), a SAIF member institution is a "depository institution the deposits of which are insured by the [SAIF]," 12 U.S.C. § 1817(l )(5) (emphasis added). Thus, BB & T contends that because, by definition, a transaction between a BIF institution and a BIF Oakar institution is not a "conversion transaction" under the Oakar Amendment, it is clear that Congress expressly excluded the resulting institution (from such a transaction) from having to pay deposit premiums to SAIF.
 
 
 42
 We are not persuaded by BB & T's contention that the plain language of the Oakar Amendment, specifically the definition of the covered "conversion transactions" and the definition of "SAIF member," unambiguously indicates that Congress expressly intended to exclude a transaction between a BIF member institution and a BIF Oakar institution, which holds deposits that are treated as insured by SAIF, from the Oakar Amendment's covered "conversion transactions" between BIF member institutions and SAIF member institutions. To the contrary, the language of the Oakar Amendment is ambiguous on this point.
 
 
 43
 The Oakar Amendment covers certain conversion transactions between a BIF member and a SAIF member, see 12 U.S.C. § 1815(d)(3)(A), and FIRREA defines a SAIF member as "any depository institution the deposits of which are insured by the Savings Association Insurance Fund." 12 U.S.C. § 1817(l )(5) (emphasis added). However, a reading of the Oakar Amendment indicates that for the purposes of an Oakar conversion transaction, a BIF Oakar institution, which holds deposits treated as SAIF-insured, could be a SAIF member.
 
 
 44
 The Oakar Amendment specifically prohibits transfers of funds between BIF and SAIF. See 12 U.S.C. § 1815(d)(3)(E)(ii). This prohibition seems to indicate that after an Oakar conversion, the resulting Oakar institution is a member of both BIF and SAIF--holding deposits that are insured by both BIF and SAIF. See id. However, when the prohibition in § 1815(d)(3)(E)(ii) is construed with the Oakar Amendment's discussion of assessments on a BIF Oakar institution, whether a BIF Oakar institution is a SAIF member for the purposes of an Oakar conversion transaction becomes unclear. The Oakar Amendment provides, "In the case of any acquiring, assuming or resulting depository institution which is a Bank Insurance Fund member [a BIF Oakar institution], that portion of the deposits of such member ... shall be treated as deposits which are insured by the Savings Association Insurance Fund." 12 U.S.C. § 1815(d)(3)(B)(i) (emphasis added). This provision stating that a resulting BIF Oakar institution merely holds deposits treated as insured by SAIF, creates an ambiguity as to whether the resulting BIF Oakar institution is, in addition to being a member of BIF, a member of SAIF. Because we find it unclear as to whether a BIF Oakar institution is a member of SAIF, we, in turn, find it unclear whether a transaction between a BIF Oakar institution and a BIF institution is a covered "conversion transaction" under the Oakar Amendment.
 
 
 45
 Determining that congressional intent is not plain from the language of the Oakar Amendment, "we look to the provisions of the whole law, and to its object and policy" to determine whether the FDIC's interpretation is a permissible construction. See First South Prod. Credit Ass'n v. Farm Credit Admin., 926 F.2d 339, 345 (internal quotations omitted) (citations omitted); see also Chevron, 467 U.S. at 845, 104 S.Ct. 2778 (holding that an agency's interpretation should be given considerable weight and should not be disturbed unless it appears from the statute or legislative history that Congress intended otherwise).[13]
 
 
 46
 The FDIC urges us to defer to its interpretation of whether a conversion transaction between a BIF member institution and a BIF Oakar institution is a "conversion transaction" under the Oakar Amendment. See 61 Fed.Reg. 64,960. The FDIC has interpreted the Oakar Amendment's "conversion transactions" as encompassing a transaction between a BIF member institution and a BIF Oakar institution because, in light of an Oakar institution's unique situation where it is obligated to two funds, "the substance of the relationship, and the effect of a deposit transfer on that relationship, is the touchstone for determining whether the deposit-transfer is a conversion transaction within the meaning of [the Oakar Amendment]." Id. at 64,963. This interpretation protects SAIF by preventing "a BIF-member buyer [from acquiring] deposits from a SAIF-member seller without paying entrance and exit fees simply by assessing the deposits through an intermediary BIF-member bank." Id. at 64,962.
 
 
 47
 We find the FDIC's interpretation consistent with the purpose and intent of FIRREA as a whole--to recapitalize the failing FSLIC-insured institutions--and the purpose of the Oakar Amendment--allowing certain conversion transactions between institutions that are BIF members and SAIF members, while protecting SAIF by requiring the resulting institution to continue to pay assessments to SAIF. As discussed supra, Congress enacted FIRREA in an effort to recapitalize the failing FSLIC-insured institutions. See Tillman, 37 F.3d at 1035. In order to recapitalize the FSLIC, Congress reorganized the deposit insurance system by designating the FDIC as the insurer of savings associations as well as banks and by requiring the FDIC to maintain two separate deposit insurance funds: BIF for banks and SAIF for savings associations. See Great Western Bank, 916 F.2d at 1423 n. 1. However, when Congress enacted FIRREA, it realized the necessity of ensuring the recapitalization of SAIF, and thus, among other measures, it extended the moratorium originally imposed by CEBA, thereby limiting the conversion of SAIF member institutions to BIF member institutions. See 12 U.S.C. § 1815(d)(2)(A)(ii). Congress in the Oakar Amendment, however, allowed certain conversion transactions between BIF members and SAIF members, but Congress, consistent with the underlying purpose of FIRREA, ensured that such transactions would not have a negative economic impact on the SAIF fund. See 12 U.S.C. § 1815(d)(3).
 
 
 48
 Specifically, Congress' intent to protect SAIF is evidenced by general language in the Oakar Amendment. Even though Congress in the Oakar Amendment allowed "conversion transactions," between BIF institutions and SAIF institutions, Congress indicated that it was not authorizing any transaction resulting in a shift of deposits from SAIF to BIF. See 12 U.S.C. § 1815(d)(3)(E)(ii). This prohibition against transfers of funds from SAIF to BIF evidences Congress' intent to protect SAIF. See id. Further, as Congress provided in the Oakar Amendment, when an Oakar conversion transaction resulted in a BIF Oakar institution, the deposits attributable to the savings association were "treated as deposits which are insured by the [SAIF]." 12 U.S.C. § 1815(d)(3)(B)(i). In other words, Congress intended to protect SAIF by requiring that subsequent to a covered "conversion transaction," the resulting Oakar institution pay assessments to both BIF and SAIF.
 
 
 49
 Therefore, while it is not clear from the plain language in the Oakar Amendment--and we note the FDIC does not contend that it is clear--Congress expressly provided that a BIF Oakar institution is a member of SAIF, such that a transaction between a BIF member institution and a BIF Oakar institution would be a covered Oakar transaction. Such a conclusion is indeed consistent with the purpose of FIRREA and the Oakar Amendment. It is clear from a reading of the Oakar Amendment, in the context of the language and purpose of FIRREA as a whole, that Congress intended to impose responsibilities to BIF and SAIF on institutions, such as a BIF Oakar institution, with deposits insured or treated as insured by both funds. Thus, a conclusion that a conversion transaction between a BIF member institution and a BIF Oakar institution is a covered "conversion transaction" under the Oakar Amendment, requiring the resulting institution to continue to pay deposit premiums to SAIF, is consistent with Congress' intent in enacting FIRREA and the Oakar Amendment; such a conclusion protects SAIF.
 
 IV
 
 50
 Accordingly, we defer to the FDIC's interpretation of the Oakar Amendment's "conversion transactions" as covering a conversion transaction between a BIF member institution and a SAIF member institution and prescribing a method for attributing deposits that an Oakar institution transfers to another institution. Specifically, we defer to the FDIC's interpretation of the Oakar Amendment as requiring BB & T, the resulting institution after mergers between BIF institutions, BB & T-NC and BB & T-SC, and BIF Oakar institutions, SNB-NC and SNB-SC, respectively, to pay assessments to SAIF according to its prescribed method. In so holding, we affirm the judgment of the district court.
 
 
 51
 AFFIRMED.
 
 
 
 [1]
 "The term 'Savings Association Insurance Fund member' means any depository institution the deposits of which are insured by the Savings Association Insurance Fund." 12 U.S.C. § 1817(l )(5)
 
 
 [2]
 "The term 'Bank Insurance Fund member' means any depository institution the deposits of which are insured by the Bank Insurance Fund." 12 U.S.C. § 1817(l )(4)
 
 
 [3]
 Congress enacted the FIRREA moratorium following the savings and loan crisis of the 1980s because it was trying to recapitalize SAIF and it did not want SAIF institutions to convert to BIF institutions to avoid the higher deposit premiums and the higher degree of supervision imposed on SAIF member institutions. See generally 12 U.S.C. § 1817
 
 
 [4]
 "The 'primary fund' of an insured depository institution is the insurance fund of which the institution is a member." 12 C.F.R. § 327.8(j)
 
 
 [5]
 "The 'secondary fund' of an insured depository institution is the insurance fund that is not the primary fund of the institution." 12 C.F.R. § 327.8(k)
 
 
 [6]
 The resulting institutions will collectively be referred to as "BB & T."
 
 
 [7]
 Congress then extended this five-year moratorium, and the FIRREA moratorium was in effect on May 26, 1996, the time BB & T-NC and BB & T-SC each merged with a BIF Oakar institution
 
 
 [8]
 The conversion transactions prohibited by the moratorium were defined as any of the following:
 (i) the change of status of an insured depository institution from a [BIF] member to a [SAIF] member or from a [SAIF] member to a [BIF] member;
 (ii) the merger or consolidation of a [BIF] member with a [SAIF] member;
 (iii) the assumption of any liability by--
 (I) any [BIF] member to pay any deposits of a [SAIF] member; or
 (II) any [SAIF] member to pay any deposits of a [BIF] member;
 (iv) the transfer of assets of--
 (I) any [BIF] member to any [SAIF] member in consideration of the assumption of liabilities for any portion of the deposits of such BIF member; or
 (II) any [SAIF] member to any [BIF] member in consideration of the assumption of liabilities for any portion of the deposits of such [SAIF] member.
 (v) the transfer of deposits--
 (I) from a [BIF] member to a [SAIF] member; or
 (II) from a [SAIF] member to a [BIF] member; ...
 12 U.S.C. § 1815(d)(2)(B).
 
 
 [9]
 Upon expiration of the moratorium, however, an Oakar institution was allowed to convert all of its deposits to its primary fund upon payment of entrance and exit fees, and then all of its deposits would be assessed at its primary fund rate. See 12 U.S.C. § 1815(d)(3)(H)
 
 
 [10]
 According to the FDIC, "An AADA is an artificial construct: a number, expressed in dollars, that is generated in the course of an Oakar transaction, and that pertains to the buyer." 61 Fed.Reg. 64,960, 64,961(1996). "The AADA fixes the amount of the institution's deposits that is to be 'treated as' insured by an Oakar institution's secondary fund." Id.; see also 12 U.S.C. § 1815(d)(3)(B)(i) ("In the case of any acquiring, assuming, or resulting depository institution which is a[BIF] member,that portion of the deposits of such member for any semiannual period which is equal to the [AADA] ... shall be treated as deposits which are insured by the [SAIF].")
 
 
 [11]
 Specifically, the FDIC explained:
 It is our understanding that the aggregate of all deposits being transferred to BIF-member banks will not reduce the Oakar bank's total deposit base below the amount of its "adjusted attributable amount" ("AADA"), which is the amount upon which the Oakar bank's SAIF assessment obligation is based.... [T]he transfer of deposits under these conditions would not be regarded as a "conversion transaction" as defined in 12 U.S.C. § 1815(d)(2)(B), ... the "insubstantial portion" test would not apply, ... conversion fees would not be required, and ... the transfer would not result in any reduction or adjustment of the AADA.
 However, if the aggregate of all deposits transferred to BIF member banks reduces the Oakar bank's total deposit base below the amount of its "adjusted attributable deposit amount," any subsequent deposit transfer by the Oakar bank to another BIF-member bank would be regarded as a conversion transaction and so subject to FDIC approval, the "insubstantial portion" test, and entrance and exit fees.
 Id.
 
 
 [12]
 Specifically, 12 C.F.R. § 327.37(a)(2) provides:
 To the extent that the aggregate volume of deposits that is transferred by the transferring institution in a transaction, or in a related series of transactions, exceeds the volume of deposits that is insured by its primary fund immediately prior to the transaction (or, in the case of a related series of transactions, immediately prior to the initial transaction in the series), the following volume of the deposits so transferred shall be deemed to be insured by the institution's secondary fund (secondary-fund deposits): the aggregate amount of the transferred deposits minus that portion thereof that is equal to the institution's primary-fund deposits. The transferring institution's volume of secondary deposits shall be reduced by the volume of the secondary-fund deposits so transferred.
 
 
 [13]
 To the extent that BB & T claims that the FDIC's interpretation is entitled to little or no deference because its interpretation contradicts its previous pronouncements, we find this claim unavailing. We find that the FDIC's interpretation has not changed. Moreover, as the First Circuit stated in Massachusetts v. FDIC, 102 F.3d 615, 621 (1996):
 [A]n agency certainly does not lose its entitlement to deference by changing its position on a matter entrusted to it by Congress. Rust v. Sullivan, 500 U.S. 173, 186, 111 S.Ct. 1759, 1768-69, 114 L.Ed.2d 233 (1991). Indeed, Chevron itself involved a case where the agency changed its position in a formal rulemaking. 467 U.S. at 863-64, 104 S.Ct. at 2791-92. "[T]he whole point of Chevron is to leave the discretion provided by the ambiguities of a statute with the implementing agency." Smiley [v. Citibank], 517 U.S. , 116 S.Ct. [1730,] 1734, 135 L.Ed.2d 25 [ (1996) ].