**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: APEX EXPRESS CORPORATION;
HUMBOLDT EXPRESS, INCORPORATED,
<u>Debtors.</u>

HUMBOLDT EXPRESS, INCORPORATED,

<u>Plaintiff-Appellee,</u>

No. 98-2204

v.

THE WISE COMPANY, INCORPORATED,
<u>Defendant-Appellant.</u>

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-97-357-3-P, BK-96-3548, BK-96-30221)

Argued: May 3, 1999

Decided: September 22, 1999

Before MURNAGHAN, LUTTIG, and KING, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opinion. Judge Murnaghan wrote the opinion, in which Judge Luttig and Judge King joined.

_____

**COUNSEL**

**ARGUED:** Raymond Andrew Selvaggio, Sr., AUGELLO, PEZOLD & HIRSCHMANN, P.C., Huntington, New York, for Appellant.

Joseph L. Steinfeld, Jr., A.S.K. FINANCIAL, Washington, D.C., for Appellee. **ON BRIEF:** George Carl Pezold, AUGELLO, PEZOLD & HIRSCHMANN, P.C., Huntington, New York; Howard M. Widis, Charlotte, North Carolina, for Appellant. John T. Siegler, Joseph A. Hess, A.S.K. FINANCIAL, Washington, D.C.; A.S.K. FINANCIAL, Eagan, Minnesota, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Plaintiff Humboldt Express, Inc. ("Humboldt"), a freight trucking corporation in bankruptcy, seeks to recover amounts allegedly owed by Defendant The Wise Co., Inc. ("Wise"), as penalties for late payment of freight charges. This case is one of hundreds of similar suits brought by the bankruptcy estate. After Humboldt went bankrupt, it paid an outside firm to "mine" its computer billing records to find long-settled accounts for which Humboldt could technically invoke the late payment penalty provisions of its tariffs.

The bankruptcy court granted summary judgment in favor of Humboldt; the district court affirmed. Both of these courts found that Humboldt had made a prima facie showing that Wise owed the late payment penalties and that Wise had not presented any evidence creating a genuine issue of material fact. Wise now appeals, claiming, inter alia, that the district court used the wrong standard of review; that a genuine issue of material fact existed; that the late payment penalties are unreasonable; that Humboldt's claim is subject to various equitable defenses; that the bankruptcy court should have referred various issues to the Surface Transportation Board ("STB"); and that Wise enjoys various statutory defenses. We affirm in part, reverse in part, and remand for proceedings consistent with this disposition.

I.

Humboldt was a trucking company which held dual authority from the Interstate Commerce Commission ("ICC") **1** to operate as a com-

_____

**1** Under the Interstate Commerce Commission Termination Act, Pub. L. No. 104-88, 109 Stat. 803 ("ICCTA"), effective January 1, 1996, the ICC

2

mon and contract carrier. Wise manufactures seats for vehicles such as trucks, tractors, boats and forklifts. From 1985 through the end of 1995, Wise used the services of Humboldt to transport its products. During its relationship with Humboldt, Wise asserts that it tendered approximately 15 to 24 shipments per month, or about 240 per year.

The rates at which Humboldt transported this freight were expressed in terms of discounts taken off of what are commonly called "class" or "bureau" rates. These "class" rates are collectively-made rates utilized by trucking companies as a benchmark. Wise asserts, however, that full class rates are seldom charged to a regular customer. Instead, each trucking company establishes discounted rates, which are the rates that are set to meet the prevailing market rate offered by competitors. These assertions are supported by the record, as Humboldt generally charged Wise a rate which was enumerated as a discount off of the class rate. During the period at issue Wise was initially receiving a 50 percent discount off the class rates. In early 1995, Wise's discount level was increased to 55 percent.

Humboldt's governing tariff provided that if a customer failed to pay its freight charges within thirty days, the customer would be penalized by losing its discount:

> PENALTY FOR NONPAYMENT OR
> LATE PAYMENT
>
> 1. Failure to make payment of freight charges to [Humboldt] for service performed as a common carrier within thirty (30) calendar days of presentation of the Freight Bill will result in the forfeiture of all discounts, allowances, commodity rates, brokerage agreements, incentives or any other reductions to which the debtor may otherwise be entitled.

(J.A. at 67.) The rule goes on to provide that if no discounts are applicable, Humboldt will assess a thirty percent (30%) late charge subject

_____

was abolished and replaced in part by the Surface Transportation Board ("STB").

to a $25.00 minimum. (Collectively, the loss of discount provision and the late payment assessment will be referred to as the "late payment penalties.")

On February 7, 1996, Humboldt filed a voluntary petition for liquidation under Chapter 11 in the U.S. Bankruptcy Court for the Western District of North Carolina. At some point, Humboldt contracted with Trans Allied Audit Company ("Trans Allied") to collect its so-called "accounts receivable." Trans Allied specializes in auditing freight bills of bankrupt or otherwise defunct trucking companies. Trans Allied has audited the books of about 100 bankrupt or otherwise defunct carriers. Wise asserts the following about Trans Allied's practices:

> Trans Allied reviews the carrier's past billing practices looking for errors to support undercharge claims and to "create" so-called "receivables". In other words, Trans Allied scours the books and records of a defunct carrier . . . looking for errors or technicalities in the trucking company's tariffs that can be used to seek additional charges on invoices that have long since been paid by the trucking company's former customers. Then, Trans Allied issues a bill to the former customers of the trucking company indicating that at the time of shipment ([often] some two or three years ago), the trucking company failed to either charge or collect the correct amount. This type of bill is typically referred to as a bill for "undercharges".[2]

(Appellant's Br. at 9.) The facts seem to bear out Wise's description of Trans Allied's practices. The case at bar is only one of hundreds of cases brought by Humboldt against its former customers in the wake of Trans Allied's audit of its accounts. Trans Allied apparently found about $15 million in potentially collectible late payment penalties and other amounts due. After Trans Allied uncovered these amounts, Humboldt sent out dunning notices to the customers who allegedly owed for past services. Fourteen of the fifteen late payment

_____

[2] Whether Humboldt's attempts to collect the late payment penalties is an attempt to collect "undercharges" is discussed at greater length at note 23, infra.

penalties Humboldt attributes to Wise were well over one year old when Humboldt began this post-bankruptcy dunning campaign in the summer of 1996. For most of the bills sent to Wise, Wise submitted evidence indicating that this campaign was the first attempt by Humboldt to impose the late charges. When the recipients of the dunning notices refused to pay, Humboldt began filing lawsuits in the bankruptcy court. The present case was filed November 8, 1996.

In order to be able to collect late payment penalties, Humboldt had to prove that it complied with the credit regulations at 49 C.F.R. part 1320.2(g) (1996).**3** See section III, infra. To establish compliance, Humboldt needed to show: (1) that Humboldt warned shippers of its late payment terms when it sent out the original freight bills; (2) the date on which original freight bills were mailed by Humboldt; (3) that payment was not received within thirty days of presentation of the original bill; and (4) that Humboldt mailed out a "Past Due" bill within 90 days after the expiration of its credit period, (5) which imposed the late payment penalty.

The first element -- whether Humboldt's freight bills warned shippers of late payment penalties -- was undisputed. Wise admits that Humboldt's freight bills contained a warning on the back which called for the possibility of a penalty for late payments.

To satisfy the remaining four elements of its prima facie case of compliance, Humboldt relied solely on information gleaned from Trans Allied's post hoc reconstruction of its computer billing records. It is not clear whether Humboldt maintained contemporaneous hardcopy records and, if so, what happened to all of such records. Trans Allied hired James Edward Cook in May 1996 to explore Humboldt's computer records to find the date on which original freight bills were allegedly generated by Humboldt, the date on which Humboldt allegedly received payment, and the date on which the Past Due bills were allegedly generated by the computer. Humboldt then generated duplicates of the Past Due freight bills which Humboldt had allegedly sent

_____

**3** Although the credit regulations also allow for service charges (i.e., interest) in addition to liquidated damages for late payment, see 49 C.F.R. part 1320.2(e), Humboldt has never asserted that the fees at issue were, in whole or in part, service charges.

5

out to each of its delinquent customers. Additionally, Humboldt created a post-hoc statement of account recreating all of the necessary data mined from its computers. The statement of account pertinent to the case at bar is reprinted in part below:

Past Due Chart

| | Billdate | PD Date | Billed | Paiddate | Paid | Total Due |
|---|---|---|---|---|---|---|
| 1 | 04/06/94 | 05/11/94 | 165.98 | 01/30/95 | 127.66 | 38.30 |
| 2 | 04/19/94 | 05/25/94 | 175.80 | 01/30/95 | 79.11 | 96.69 |
| 3 | 05/06/94 | 06/15/94 | 161.09 | 01/30/95 | 80.54 | 80.55 |
| 4 | 06/17/94 | 07/27/94 | 415.89 | 01/30/95 | 207.94 | 207.95 |
| 5 | 06/20/94 | 08/03/94 | 325.25 | 01/30/95 | 146.36 | 178.89 |
| 6 | 08/08/94 | 09/14/94 | 6,056.50 | 01/30/95 | 2,725.40 | 3,331.10 |
| 7 | 10/10/94 | 11/16/94 | 794.70 | 01/30/95 | 611.31 | 183.39 |
| 8 | 10/20/95 | 11/30/94 | 227.57 | 01/30/95 | 175.05 | 52.52 |
| 9 | 01/10/95 | 02/15/95 | 496.27 | 03/13/95 | 248.13 | 248.14 |
| 10 | 01/20/95 | 03/01/95 | 358.02 | 03/13/95 | 161.11 | 196.91 |
| 11 | 01/25/95 | 03/01/95 | 710.98 | 03/13/95 | 355.49 | 355.49 |
| 12 | 01/26/95 | 03/08/95 | 503.00 | 03/20/95 | 251.50 | 251.50 |
| 13 | 01/28/95 | 03/08/95 | 2,085.60 | 03/20/95 | 896.79 | 1,188.80 |
| 14 | 02/08/95 | 03/17/95 | 198.70 | 03/20/95 | 89.41 | 109.29 |
| 15 | 09/26/95 | 11/02/95 | 94.07 | 11/13/95 | 69.07 | 25.00 |
| | | | _____ | | _____ | |
| | | | 6244.89 | | 6544.52 | |

In the case at bar, Humboldt seeks to collect the $6,544.52 in "Total Due" penalty charges for the above fifteen freight bills, which were allegedly paid late. Humboldt alleged that it mailed fifteen original freight bills to Wise on or about the "Billdate" dates in 1994 and 1995 identified above. These fifteen freight bills were allegedly not paid within thirty days. Humboldt allegedly sent another, "Past Due," freight bill, on or about the dates in 1994 and 1995 which are identified above as the "PD Date." It is undisputed that Wise paid only the "Paid" amount on the "Paiddate" enumerated above. Therefore, Humboldt sought to collect the "Total Due" for each bill.

In response to Humboldt's claims, Wise introduced copies of the freight bills that it allegedly actually received in connection with the shipments at issue. Of the fifteen freight bills at issue, twelve

(invoices 1-8 and 12-14) are denoted in the upper right-hand corner as "REPRINT." Wise was not able to substantiate the exact date on which it received each freight bill, but the fax date on some of the REPRINT bills indicates that Wise received these bills several months after Humboldt contends they were sent.

Wise also submitted evidence that since 1988, Wise retained Allen Traffic Service ("ATS") to pre-audit freight bills from the carriers used by Wise. As a customary and routine business practice, Wise accumulated all carrier freight bills received during the course of a week and sent them to ATS on the Friday of that week or the following Monday. ATS audited the bills to determine if the freight charges were correct and returned them to Wise for payment within five days from when ATS received them. A representative of ATS stated that "[t]he only freight bills received for these[fifteen] shipments are those [fifteen] freight bills" submitted by Wise. (J.A. at 192.) Significantly, in only three (invoices 10, 11, and 15) of the freight bills had Humboldt added the late payment penalty to the amount due, even though all of the freight bills except one (invoice 14) were sent to Wise after Humboldt's asserted "PD Date." [4]

On May 28, 1997, the bankruptcy judge held a hearing on motions for summary judgment by Humboldt and Wise and a motion by Wise for stay and referral to the Surface Transportation Board. On June 10, 1997, the bankruptcy court granted Humboldt's motion for summary judgment and denied Wise's motions. The bankruptcy court denied Wise's motion for reconsideration on June 13, 1997. Wise timely filed a notice of appeal of this decision.

The district court affirmed the bankruptcy court's order on June 17, 1998. The district court held that Humboldt had fulfilled its prima facie case and Wise had presented no evidence competent to create a genuine issue of material fact. The district court also agreed that referral to the Surface Transportation Board was not necessary. Wise timely filed a notice of appeal of this decision.

_____

[4] It is unclear when invoice 9 was sent to Wise.

II.[5]

A.

The district court followed the bankruptcy court in holding that the present proceeding was in the nature of an attempt to collect accounts receivable and so is a "core" proceeding within the meaning of 28 U.S.C.A. §§ 157(b)(2)(A), (E), and (O) (West 1993).[6] What is at stake is the proper standard of review applicable to the bankruptcy court's factual determinations. If the proceeding is a core proceeding, the district court correctly reviewed the bankruptcy court's factual determinations for clear error and its legal conclusions de novo. Fed. R. Bankr. P. 8013. See also In re Johnson, 960 F.2d 396, 399 (4th Cir. 1992). If the proceeding is non-core, the district court should have undertaken a de novo analysis of both the factual findings to which Wise objected and the law. See 28 U.S.C.A.§ 157(c)(1) (West 1993). See also In re Johnson, 960 F.2d at 399.

_____

[5] Wise has not urged in its briefs before this Court several arguments that it raised before the bankruptcy and district courts including, inter alia, that Humboldt was required to establish the postmark date on which it sent out the various bills under 49 C.F.R. part 1320.4(c) (1996); that Humboldt's late payment penalties are void as against public policy; that Humboldt's record keeping did not comply with ICC regulations; that Humboldt aggregated its late payment bills in violation of 49 C.F.R. part 1320.2(g)(2)(iii); that the Federal Aviation Administration Authorization Act of 1994 preempts Humboldt's attempts to enforce its late payment penalties; that Humboldt's late payment provisions did not apply to the shipments at issue; and that Wise was entitled to summary judgment on the intrastate claims. Therefore, we do not address those issues. See Canady v. Crestar Mortgage Corp., 109 F.3d 969, 973-74 (4th Cir. 1997) (issues raised in notice of appeal but not briefed on appeal deemed waived).

[6] Core proceedings include, but are not limited to: "(A) matters concerning the administration of the estate; . . . (E) orders to turn over the property of the estate; . . . (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship, except personal injury tort or wrongful death claims." 28 U.S.C.A. § 157(b)(2) (West 1993).

8

We disagree with the district court and the bankruptcy court that Humboldt's claim is a core proceeding. In Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982), the Supreme Court struck down portions of the Bankruptcy Act of 1978 as violative of Article III of the Constitution. See Northern Pipeline, 458 U.S. at 87. The chief basis for the plurality opinion was that the Bankruptcy Act of 1978 allowed non-article III courts (i.e., bankruptcy courts) to hear claims based upon state-created private rights that arose independent from and antecedent to the bankruptcy proceedings and involved strangers to the bankruptcy action. See id. at 84 (plurality opinion). In the wake of Northern Pipeline, Congress enacted the core/non-core distinction to try and remedy the defects in the bankruptcy system. See Bankruptcy Amendments and Federal Judgeship Act of 1984 (1984 Act), Pub. L. No. 98-353, 98 Stat. 333 (1984).

The distinction between what is "core" and what is "non-core" is far from clear. On the one hand, a broad reading of the literal terms of the statutory text could lead to the result that courts treat just about every dispute as "core." See, e.g. , 28 U.S.C.A. § 157(b)(2)(A) ("matters concerning the administration of the estate"); § 157(b)-(2)(O) ("Other proceedings affecting the liquidation of the assets of the estate"). But, the statute must be interpreted keeping in mind (1) that Congress passed it in response to the defects revealed by Northern Pipeline, and (2) that Northern Pipeline remains good law, even if perhaps narrowed by subsequent decisions, see Thomas v. Union Carbide Agric. Products Co., 473 U.S. 568 (1985); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833 (1986).

Courts are split on whether "accounts receivable" claims against strangers to the bankruptcy proceeding and other litigation based on pre-petition contract-based rights are core or non-core. The bankruptcy court followed In re Wilson Feed Co., Inc., 142 B.R. 123 (Bankr. E.D. Va. 1992); In re Leco Enterprises, Inc., 125 B.R. 385 (S.D.N.Y. 1991); In re Allegheny, Inc., 68 B.R. 183 (Bankr. W.D. Pa. 1986); In re National Equipment & Mold Corp., 60 B.R. 133 (Bankr. N.D. Ohio 1986), in holding that Humboldt's claim was a core proceeding. See also In re American Freight System, Inc., 164 B.R. 341 (D. Kan. 1994); In re Bingham Systems, Inc., 139 B.R. 809 (Bankr. N.D. Miss. 1991); In re Total Transp., Inc., 87 B.R. 568 (D. Minn.

9

1988). These courts reason that "accounts receivable" actions are core because they represent estate assets, often a substantial portion of such assets, and therefore their prompt resolution concerns the administration of the estate under § 157(b)(2)(A), and affects liquidation of the estate under § 157(b)(2)(O). See, e.g., In re Leco Enterprises, 125 B.R. at 389-90; In re Franklin Computer Corp. , 60 B.R. 795, 802 (Bankr. E.D. Pa. 1986). Further, requiring the bankruptcy trustee to litigate such claims in state court would impose an administrative burden on the bankruptcy estate. See, e.g. , In re Wilson Feed Co., 142 B.R. at 126. The courts also view accounts receivable claims to be "turnover" claims under § 157(b)(2)(E), because they believe that accounts receivable are property of the estate which is due, payable on demand, and for a sum certain within the meaning of a "turnover" proceeding under 11 U.S.C.A. § 542(b) (West 1993). These courts view the § 542(b) rights of trustees to pursue mature debts to be "a traditional type of proceeding which is at the core of a bankruptcy." In re Best Refrigerated Express, Inc., 132 B.R. 420, 421 (Bankr. D. Neb. 1991).

We think the better approach is that such claims, at least when grounded in state law and arising pre-petition, must be treated as non-core.[7] A majority of courts have taken this approach. See, e.g., Beard v. Braunstein, 914 F.2d 434, 444-445 (3rd Cir. 1990); In re Orion Pictures Corp., 4 F.3d 1095, 1102 (2nd Cir. 1993); In re Pisgah Contractors, Inc., 215 B.R. 679 (W.D.N.C. 1995); In re National Enterprises, Inc., 128 B.R. 956, 960 (E.D. Va. 1991); In re Maislin Indus., U.S., Inc., 50 B.R. 943, 948-950 (Bankr. E.D. Mich. 1985)); In re Mec Steel Buildings, Inc., 136 B.R. 606, 610 (Bankr. D.P.R. 1992); In re United Security & Communications, Inc., 93 B.R. 945, 957 (Bankr. S.D. Ohio 1988) ("clear majority, and better-reasoned, view" is to treat pre-petition accounts receivable as non-core); In re Tobler Transfer, Inc., 74 B.R. 373, 375 (Bankr. C.D. Ill. 1987). We also note that without analysis this Court has referred to similar claims as non-core proceedings. See In re Bulldog Trucking, Inc., 66 F.3d 1390, 1392-93 (4th Cir. 1995). The primary reason for our holding is that such claims fall squarely under the dictates of Northern Pipeline. Congress may not force non-consenting claimants whose claims are

---

[7] When a creditor files a claim with the bankruptcy court, though, she has consented to its jurisdiction.

10

based on state-created private rights into non-Article III courts. See Northern Pipeline, 468 U.S. at 70-72, 77, 81-84.

Further, the logic used by the courts which would treat "accounts receivable" and other basically contract claims as "core" proves too much. The main justification supplied by these courts is that because the accounts receivable are in some sense the property of the bankruptcy estate, and because the outcome of the claim will affect the bankruptcy estate (by altering its size), then the claims are "core." See, e.g., In re Leco Enterprises , 125 B.R. at 389-90; In re Franklin Computer Corp., 60 B.R. at 802. But, under this logic any claim involving a potential money judgment would be considered core, even the precise contract claim at issue in Northern Pipeline. Thus, the rationale used by these courts would swallow the rule established by Northern Pipeline. See In re Orion Pictures , 4 F.3d at 1102 (to treat pre-petition contract claims as core proceedings under §§ 157(b)-(2)(A) or (O) "creates an exception to Northern Pipeline that would swallow the rule.").

Finally, we believe that the courts treating pre-petition contract-based claims as "core" proceedings pay insufficient attention to the public rights/private rights distinction which was a key aspect of Northern Pipeline. See Northern Pipeline, 458 U.S. at 69-72, 77 (plurality opinion). Cf. also Granfinanceria, S.A. v. Nordberg, 492 U.S. 33, 53-55 (1989) (dealing with Seventh Amendment jury trial right; stating analysis is the same for Article III and Seventh Amendment jury trial rights and re-affirming importance of public rights/private rights distinction in the analysis). But cf. Thomas, 473 U.S. at 585-86 (public rights/private rights distinction not determinative for Article III purposes). The Court in Northern Pipeline  observed that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power" is a public right. Northern Pipeline, 458 U.S. at 71 (plurality opinion). Because the public right nature of bankruptcy proceedings gives Congress the power to assign judicial functions to non-Article III bankruptcy courts, the core/non-core distinction should depend upon the connection the claim has to this public right. The type of dispute at issue only has some theoretical and indirect impact on the public act of debt restructuring. But, the dispute itself is entirely separate and entirely private -- the contract-based liability between two private parties. See id. at 69-70 (plurality

11

opinion) (citing <u>Crowell v. Benson</u>, 285 U.S. 22, 51 (1932)). The resolution of the present private right dispute is hardly at the core of restructuring debtor-creditor relationships. To be faithful to <u>Northern Pipeline</u>, we must treat such a private rights dispute as a non-core matter.

The present case is complicated because while Humboldt's claim is fundamentally contractual in nature, the governing law is federal not state. <u>Northern Pipeline</u> indicated that Congress has greater leeway in assigning resolution of federally-created rights, even private rights, to non-Article III tribunals. <u>See Northern Pipeline</u>, 458 U.S. at 81-84 (plurality opinion). We believe, however, that the federal nature of the dispute involved is only incidental to the question being discussed. First, the Supreme Court stated in <u>Schor</u> that "there is no reason inherent in separation of powers principles to accord the state law character of a claim talismanic power in Article III inquiries." <u>Schor</u>, 478 U.S. at 852. <u>See also</u> 28 U.S.C.A. § 157(b)(3). We think the same can be said for the federal law character of a claim. Second, the issue here is not whether Congress could assign a dispute over interstate freight billing to a non-Article III tribunal; the question is whether Congress assigned such a dispute to a non-Article III tribunal under the language of 28 U.S.C.A. § 157(b)(2). We conclude that the answer to the latter question is clear. Section 157(b)(2) defines "core" and "non-core" without reference to the federal or state nature of the right. A pre-petition state-based contract claim and a pre-petition federal-based contract claim stand in the same position vis-a-vis the statutory language of § 157(b)(2) and vis-a-vis the core public rights function of bankruptcy courts. There is thus no reason to treat the claim at issue any different than a pre-petition state-based contract claim.

B.**8**

Thus, the bankruptcy and district courts erred in holding that the

_____

**8** Because we conclude that the bankruptcy court's factual findings were clearly erroneous, our disposition of the above issue is not crucial to the remainder of our decision. It will, however, affect the district court's review on remand.

proceeding was a core proceeding, and the district court therefore erred in applying the incorrect standard of review.

Because this was a motion for summary judgment and we have before us all of the facts developed below, rather than remanding to the district court so that it can conduct a <u>de novo</u> factual analysis, we undertake that <u>de novo</u> analysis in the first instance.

III.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court should grant a motion for summary judgment only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986). In deciding the motion, the court must consider whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant, in this case Wise. <u>See</u>, <u>e.g.</u>, <u>Helm v. Western Maryland Ry. Co.</u>, 838 F.2d 729, 734 (4th Cir. 1988); <u>Anderson</u>, 477 U.S. at 255.

Wise must set forth specific facts showing a genuine issue, and it may do so by reference to the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." <u>See</u> Fed. R. Civ. P. 56(c). Wise cannot satisfy its burden by simply showing a mere metaphysical doubt about the facts. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

The bankruptcy court[9] held that there were no genuine issues of material fact. First, the court found that Humboldt had fulfilled its prima facie case against Wise. This holding by the bankruptcy court is reasonable: Wise's discovery responses admitted receipt of the freight bills, notice of the credit terms including the late payment pen-

_____

[9] The district court merely adopted the factual findings and legal conclusions of the bankruptcy court. Therefore, although we formally are reviewing the district court's decision, we will frequently refer to the bankruptcy court's decision.

13

alty, receipt of Past Due bills,**10** and failure to pay the late payment charges.

Second, the bankruptcy court held that the various affidavits and other evidence provided by Wise were insufficient to demonstrate a genuine issue of material fact. The bankruptcy court deemed the affidavit of Wise's president, James Freudenberg, to be irrelevant because it did not indicate that Freudenberg had any personal knowledge or basis for his statements and thus must have been based on conjecture or hearsay.**11** See Fed. R. Civ. P. 56(e). The court rejected the affidavit of the contractor in charge of handling Wise's freight billing, Bob Allen, because it allegedly "simply misse[d] the point." The court thought that Allen's statement that Humboldt did not send Allen the original invoices did not address whether such invoices had been sent to Wise. Finally, the court noted that"conspicuously absent" from Wise's submissions were any contemporaneous business records or other evidence to support its assertions. Therefore, the court made all of its findings in favor of Humboldt and accepted Humboldt's re-created computer records as conclusive evidence that Humboldt sent out the required original invoices and Past Due invoices with late payment penalties.

We find error in the bankruptcy court's conclusion that there were no genuine issues of material fact. We first reiterate Humboldt's burden. At the time of facts giving rise to this case, carriers were allowed to extend credit only pursuant to regulations established by the ICC. See 49 U.S.C.A. § 10743(a), (b) (West 1995). Under the regulations established by the ICC, Humboldt had to show (1) that it gave notice to Wise of its late payment penalty provisions; (2) that it sent out the

_____

**10** Wise did admit that it had received Past Due bills. Crucially, however, Wise never admitted that these bills contained revised rates reflecting that Humboldt was imposing a late payment penalty. Wise maintains that most of the Past Due bills it received contained the original, discounted rate.

**11** It is worth noting that two of the three affiants for Humboldt based the majority of their relevant statements on hearsay, not personal knowledge. See Affidavit of Rodney A. Johnson, J.A. at 86-90; Affidavit of James Edward Cook, J.A. at 92-95. The bankruptcy court never addressed this point.

14

original freight bill; (3) that payment was not received within thirty days of presentation of this bill; (4) that it sent out a Past Due freight bill within 90 days after the original thirty day period had elapsed (i.e., within 120 days of original billing); and (5) that the Past Due bill was revised in that it imposed a late payment penalty. See 49 C.F.R. part 1320.2(g) (1996); Interstate Commerce Commission v. Transcon Lines, 513 U.S. 138, 148-49 (1995).**12** See also, e.g., Dillard Depart-

_____

**12** Although both parties have assumed the applicability of Transcon to the case at bar, we note Transcon does not dictate that Wise may raise 49 C.F.R. part 1320.2(g)(2) as a defense. See Transcon, 144-147 (declining to address "whether or not we would allow shippers to defend against a carrier's collection action by relying on the carrier's violation of credit regulations"). We hold, however, that a carrier must show compliance with the regulations formerly in 49 C.F.R. part 1320.2 before it can collect late payment penalties. The case which gave the Supreme Court pause in Transcon was Southern Pacific Transp. Co. v. Commercial Metals Co., 456 U.S. 336 (1982). That case is distinguishable on several bases. First, as recognized by the Supreme Court in Transcon, 513 U.S. at 146, the defendant in Commercial Metals was seeking to enforce a regulation which was intended to benefit the carrier. Here, Wise seeks to enforce regulations which were intended to benefit shippers such as Wise. Second, in Commercial Metals, to the extent that the ICC had spoken on the topic, it had indicated that a defendant of the type involved could not raise as an affirmative defense a violation of the regulation at issue. See Commercial Metals, 456 U.S. at 345. No such pronouncements exist to limit the regulations invoked by Wise. In fact, the governing law indicates that shippers should be able to challenge charges subsequently billed by carriers. See 49 U.S.C.A. § 13710(a)(3)(B) (West 1997). And, the ICC/STB has indicated that shippers should be able to invoke the credit regulations at issue. See, e.g., Dillard Department Stores, Inc.--Petition for Declaratory Order--Certain Rates and Practices of P*I*E Nationwide, Fed. Carr. Cas. (CCH)¶ 38,188, 1995 WL 277124 (I.C.C. May 12, 1995) [hereinafter Dillards]. Third, regardless of whether Wise could raise an affirmative defense, Humboldt must show as part of its prima facie case compliance with the applicable credit regulations because absent such compliance, Humboldt may not impose late payment penalties. See 49 C.F.R. part 1320.2(g)(2)(vi) (using the mandatory "shall"); Transcon, 513 U.S. at 141 ("Before collecting liquidated damages by tariff rule, however, a carrier must follow specified procedural requirements." (emphasis added)); Dillards, Fed. Carr. Cas. ¶ 38,188, 1995 WL 277124.

15

ment Stores, Inc.--Petition for Declaratory Order--Certain Rates and Practices of P*I*E Nationwide, Fed. Carr. Cas. (CCH) ¶ 38,188, 1995 WL 277124 (I.C.C. May 12, 1995).

Wise submitted evidence sufficient to create genuine issues of material fact as to each of the last four required showings in the above paragraph. First, Wise presented evidence tending to show that it never received the original invoices. Freudenberg's affidavit states outright that the original freight bills were never received by Wise. The bankruptcy court dismissed Freudenberg's statements on the basis of lack of foundation. See Fed. R. Civ. P. 56(e). Freudenberg, however, was the president of a small business for 30 years. We have held in the Rule 56(e) context that "ordinarily, officers would have personal knowledge of the acts of their corporations." Catawba Indian Tribe of South Carolina v. South Carolina, 978 F.2d 1334, 1342 (4th Cir. 1992). Therefore, in the absence of evidence from Humboldt that Freudenberg was not competent to testify, we assume that he was. See id.

We need not rely solely on Freudenberg's statement that Wise did not receive the original invoices from Humboldt, however. Even if we had some doubts about whether Freudenberg was competent to testify about the receipt of fifteen specific invoices, we have no trouble under Catawba finding Freudenberg competent to testify as to Wise's regular invoice payment business practices. Freudenberg stated that Wise's regular business practice since 1988 was to forward all freight invoices received to Allen Traffic Service ("ATS"). Bob Allen, president of ATS, submitted an affidavit confirming that Wise's routine was to forward all freight invoices to Allen. Allen's affidavit states that the original bills at issue were not received. The bankruptcy court's assertion that Allen's affidavit "misses the mark" because it deals with whether ATS received the bills rather than whether Wise received them is itself off-target. Wise presented evidence that, in the regular course of its business every freight invoice received by Wise was forwarded to Allen. Thus, in the normal course of business, Allen was the custodian of Wise's freight bills (i.e., business records) received in its regularly conducted business activities.[13] The absence

_____

[13] Humboldt argues that Wise's interrogatory answers, in which Wise identified one Wilma Fulghum as "the person(s)" at Wise who served as

16

of business records can be used as evidence to prove the non-existence of such a record. See Fed. R. Evid. 803(7). It was error, then, for the bankruptcy court to reject Allen's testimony, especially given that all inferences were to be drawn in Wise's favor. We think that these two affidavits combined create a genuine issue of material fact as to whether Humboldt actually sent Wise the original bills for the fifteen invoices at issue.

Second, the above evidence also creates genuine issues of material fact as to whether some of the Past Due bills were sent out within the required 120 days. The evidence tends to show that the only bills for invoices one through eight, see Past Due chart, supra, were sent on January 20, 1995. Therefore, for invoices one through six, the bill, even assuming it was a valid revised Past Due invoice, was sent after the 120 day period had expired.

Third, Wise presented evidence indicating that Humboldt's recreated statement of account is generally inaccurate. Wise submitted copies of actual freight bills received by Wise from Humboldt regarding each specific freight charge at issue.[14] Twelve of the fifteen bills at issue (invoices 1-9, 12-14), were identified as"REPRINTs." Ten of these REPRINTs (invoices 1-8, 12-13) contain facsimile headers indicating that they were sent to Wise by Humboldt some time after the PD Date shown on the statement of account submitted by Humboldt. This creates a genuine issue of material fact whether Humboldt's post hoc computer recreations can be relied upon at all.

Humboldt seeks to explain the discrepancy in the dates by stating that faxing of REPRINT bills was done for various purposes and was not necessarily recorded in its computer systems. This explanation,

_____

the custodian and individual responsible for freight invoice payment, showed that neither Freudenberg nor Allen was competent to testify on the matters in their affidavits. These interrogatory answers, however, do not establish that no one other than Ms. Fulghum had the requisite knowledge to testify about Wise's freight invoice practices.

[14] Thus, the bankruptcy court was in error when it stated that Wise had not submitted any contemporaneous business records. In fact, the only contemporaneous business records submitted below came from Wise.

17

while potentially persuasive, proves the point, however -- there is a genuine factual dispute as to the implications of the REPRINT bills.

Fourth, and most importantly, Wise submitted evidence which tended to show that for most of the invoices at issue, Humboldt's Past Due bills did not include the late payment penalties. Ten of the REPRINT bills (invoices 1-8, 12-13) were sent to Wise after the date when these bills became past due, and these bills still reflect discounted freight charges (i.e., no late payment penalty was included). Given all inferences in Wise's favor, we hold that this documentary evidence itself creates a genuine issue of material fact at least as to these ten bills.**15**

In addition to the above issues of material fact, we also note that Wise presented evidence sufficient to create a genuine issue of material fact with regard to whether Wise may raise equitable defenses against Humboldt's collection of the late payment penalties.**16** Both Freudenberg and Allen's affidavits state that Wise routinely ignored late fees and that Humboldt acquiesced in this practice. This testimony was inconsistent with affidavits submitted by Humboldt's witness Baird.**17**

We therefore reverse the district court's grant of summary judgment. The Freudenberg and Allen affidavits and Wise's copies of the

_____

**15** Wise also notes that the bankruptcy judge who handled the case below has since ruled in a companion case that Humboldt was not entitled to recover when the defendant produces REPRINT bills which continue to show the discounted amounts. See Humboldt v. Smith Fiberglass, Adv. Pro. No. 96-3886, slip op. at 9-10 (Bankr. W.D.N.C. 1997). We do not pass on that issue.

**16** Other aspects of such equitable defenses are discussed at section V, infra.

**17** It is worth noting that Baird's testimony was specious on the record. Baird stated that "Wise was habitually late in paying its bills and refused to cooperate with our demands for timely payment." (J.A. at 55.) The record shows that, on average Wise would have tendered approximately 720 shipments during the time frame audited. Humboldt found unpaid late payment penalties on only 15 of these -- only 2% of Wise's business with Humboldt.

18

REPRINT bills create genuine issues of material fact as to whether Humboldt's post hoc recreation of its billing practices was accurate. Summary judgment is inappropriate in the face of such disputed issues of material fact.

IV.

A.

Wise argues that, even if Humboldt had fulfilled all of the procedural requirements to be able to charge Wise late payment fees, such late payment fees would be unreasonable and unenforceable as penalties rather than as liquidated damages. For support, Wise cites to the only published case that squarely addressed the issue, Robins Motor Transportation, Inc. v. Associated Rigging & Hauling Corp., 944 F. Supp. 409 (E.D. Pa. 1996):

> In accordance with general principles of contract law, any award of liquidated damages [for a late payment fee] must be reasonable. 49 U.S.C. § 13701(a)(1) (1996) ("A rate, classification, rule, or practice related to transportation or service . . . must be reasonable."); 49 U.S.C. § 10701 (1995) ("A rate . . . classification, rule, or practice related to transportation or service related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission . . . must be reasonable."); 49 C.F.R. part 1320.2(g)(1) (1995) ("Carriers may, by tariff rule, assess reasonable and certain liquidated damages for all costs incurred in the collection of overdue freight charges."); Regulations for Payment of Rates and Charges--Penalty Charges for Nonpayment, 1988 WL 224678, n.2 (Feb. 17, 1988) ("Penalty") ("The level of the [liquidated damages] charge would, of course, be subject to review on reasonableness grounds under 49 U.S.C. § 10701.").

Id. at 410-11 (emphases added). Wise also cites to the ICC's statement made when promulgating the credit regulations allowing the loss of discount provision that "[t]he [late payment fee] . . . should be reasonably tied to the carrier's anticipated collection expenses." Regulations for Payment of Rates and Charges--Penalty Charges for

19

Nonpayment, 4 I.C.C.2d 340, 344, 1988 WL 224678 (April 3, 1988). Based on the above authority, Wise argues that in order to be reasonable and enforceable, a late penalty provision must not be a "penalty," but must qualify as "liquidated damages," as that term is defined in the general common law.

Humboldt argues that Wise's arguments here are unfounded because the general common law concepts cited by Wise are pre-empted by federal law. See 49 U.S.C.A. § 14501(c)(1) (West 1997) (state may not "enact or enforce a law, regulation, or other provision" related to a price, route, or service of any motor carrier).

Humboldt misconstrues Wise's argument, however. Wise bases its penalty-versus-liquidated damages arguments on federal common law, not state law.[18] We find Wise's arguments persuasive and adopt the approach in Robins. In addition to the sources cited by Wise, we also note the following support for Wise's position: The regulation allowing for the imposition of late payment penalties refers to them as "liquidated damages," see 49 C.F.R. part 1320.2(g)(1), thus impliedly referencing the federal common law on liquidated damages. The Supreme Court has also recognized that the late payment penalties allowed in 49 C.F.R. part 1320.2(g) are to be treated as liquidated damages. See Transcon, 513 U.S. at 141. Finally, the ICC/STB has reiterated that late payment penalties must be reasonably tied to collection costs. See Delta Traffic Service, Inc. v. Mennen Co., 730 F. Supp. 1309, 1313 (D.N.J. 1990) (stating on referral that 35% loss of discount late payment penalty was unreasonable because, inter alia, it was not related to the carriers costs).

_____

[18] Wise also rejects the argument that state common law of contract was preempted by § 14501. Cf. American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995) (rejecting preemption of state common law of contract by federal law almost identical to 49 U.S.C.A. § 14501(c)(1)). Noting that the logic of Wolens would not necessarily apply to "binding standards of conduct that operate irrespective of any private agreement," see id. at 229 n.5, like the anti-penalty doctrine, we decline to address this issue.

B.

The courts below dismissed Wise's reasonableness/penalty claim on the basis that Wise had presented no evidence that the late payment fees sought to be charged by Humboldt were unreasonable. Wise submitted no evidence indicating what other carriers charged as late payment fees. The bankruptcy court observed that "[i]t appears from the record here (and in related cases) that discounts -- and discounts of the magnitude of Humboldt's -- were common in the trucking industry; that loss of discount penalties were common in the industry; and that this was accepted practice in the industry." (J.A. at 38.)

Wise, for its part, notes the general rule that liquidated damages are not a penalty only if such damages are "reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss." Restatement (Second) of Contracts§ 356 (1981). See also Priebe & Sons, Inc. v. United States, 332 U.S. 407, 413 (1947). Wise asserts that it cannot seriously be questioned that the amount of liquidated damages sought herein is grossly disproportionate to Humboldt's actual damages and collection costs. The original freight charges were $6,224, while the "late payment" charges now sought to be collected are $6,544 -- some 105% of the cost of the service itself.

At this preliminary stage, we pay attention to what Wise contends. The test of "reasonableness" must be evaluated through the liquidated damages/penalty lens. Given the size of the late payment fees at issue in relation to the original charges, we find that, without further evidence, Wise has made a prima facie showing of unreasonableness.[19]

_____

[19] We agree that having comparative figures would be useful, but disagree that such figures are necessary. First, we note that cases indicating that a shipper should provide comparative rates in order to show unreasonableness of the rate as a whole, see, e.g., Miller v. WD-40 Co., 29 F. Supp.2d 1040, 1045 (D. Minn. 1998); Lewis v. Shepard's/McGraw-Hill, Inc., 829 F. Supp. 348, 351 (D. Colo. 1993), are inapposite. We deal here only with the reasonableness of the liquidated damages charges, not the rate as a whole. The latter inquiry is a fairly technical one which generally requires some comparative information. The former inquiry, however does not. The penalty/liquidated damages analysis is based on the reasonableness of the fee in light of the costs incurred by the carrier, not in light of the costs incurred by its competitors.

21

The court's reliance on the fact that "everyone else is doing it" is misleading. The court noted that all other carriers provide steep discounts and include on their tariffs loss of discount provisions. While everyone agrees that large discounts are routinely given, see also Delta Traffic Service, 730 F. Supp. at 1313 (observing that since 1980 few shipments have moved at the full tariff rate), the key issue here is whether the penalty provisions are routinely ignored. We think that taking all inferences in Wise's favor the record indicates that it was rare that a carrier, at least a solvent one, would actually seek to enforce its late payment provisions.

The few cases that we could find on the subject also support Wise at the summary judgment stage. In Robins, the court sua sponte found that a 50% late payment collection charge was an unreasonable penalty "that bears no relationship to the[ ] actual or reasonably estimated collections costs." See Robins, 944 F. Supp. at 412. Similarly, the ICC found in Delta Traffic Service that the loss of a 35% discount is "a severe penalty that is not related to the cost of credit." Delta Traffic Service, 730 F. Supp. at 1313. The case at bar involved loss of discounts of between 50% and 55% (i.e., collection costs of between 100% and 122%). Collection costs of such magnitude seem to us to be prima facie unreasonable.[20]

The district court and bankruptcy court also reasoned that Humboldt's loss of discount provision must be presumed valid, reasonable and enforceable as a mandate of the ICC/STB because 49 C.F.R. part 1320.2(g)(1)(ii) allows carriers to eliminate discounts as a method of calculating liquidated damages. This argument is question-begging and proves too much, however. The regulation which allows loss of discount as liquidated damages does not at all indicate whether the amount of any particular loss of discount provision is reasonable and enforceable. In fact, 49 C.F.R. part 1320.2(g) specifically requires that late payment fees be "reasonable." Under the above reasoning, absolutely any loss of discount provision would be per se reasonable.

_____

[20] If Humboldt's liquidated damages of 50% were stated in terms of the annualized cost of credit, which is essentially what they are in this case, the rate would be approximately 400% (assuming payment after 120 days).

22

That approach would read the "reasonableness" requirement out of the regulation.

Therefore, we conclude that summary judgment was erroneously granted against Wise's unreasonableness claim. We do not go so far as to hold that Humboldt's late payment penalties are unreasonable, but remand the issue to the district court for further development.

V.

Wise argues that, even if Humboldt had fulfilled the requisite procedural requirements to charge a late fee, such fees would not be recoverable because of various equitable defenses, including waiver, estoppel, and laches. Wise bases its claim on an unpublished case, Moore's Trucking Co. v. National Starch & Chemical , 1994 WL 741081 (D.N.J. Sept. 27, 1994). In Moore's, the plaintiff motor carrier sought loss of discount late payment fees of over $216,000 on 2,025 bills. The court dismissed the claim in its entirety on waiver, estoppel, and laches grounds based on the following facts: (1) the motor carrier had accepted payment of the discounted amount on the bills in question without protest; (2) the motor carrier had continued to do regular business with the customer during the relevant time period without indicating an intent to actually enforce the loss of discount provision; (3) the motor carrier had waited between two and four years to pursue the loss of discount provisions; and (4) the customer had relied upon this non-enforcement insofar as the customer could have sought out a new carrier if it had known that the motor carrier intended to enforce the loss of discount provisions after all. Wise asserts that Moore's is on all fours with the case at bar.

The bankruptcy court found that Moore's was distinguishable. In particular, the court noted that the evidence showed that Humboldt had routinely demanded payment of the loss of discount penalty and had not waited two to four years to make its first demand for payment.

Insofar as waiver, estoppel, and laches are possible in the case at bar,**21** we believe that there is a genuine issue of material fact as to

_____

**21** We affirm the district court on this issue as regards the six bills that were governed by the filed rate doctrine (invoices 1-6 on the Past Due

23

whether they apply. The crucial questions for these claims are the crucial questions for the case as a whole -- did Humboldt actually send out late payment notices and did these notices contain newly calculated charges reflecting the loss of discount. Because the bankruptcy court's rejection of those defenses was contingent upon its erroneous conclusion that there was no genuine issue of material fact as regards these crucial questions, we reverse and remand, pending resolution of the factual issues.

VI.

Wise claims that the Negotiated Rates Act of 1993, Pub. L. 103-180, 107 Stat. 2044 ("NRA"), is applicable to the case at bar. The NRA would provide Wise with several affirmative defenses if it were applicable -- a small business exemption from paying Humboldt's additional charges, see 49 U.S.C.A. § 13709(h) (West 1997); certain statutory settlement options, see 49 U.S.C.A. § 13709(b) (West 1997); and a per se "unreasonable practice" defense, see 49 U.S.C.A. § 13711(a) (West 1997 & Supp. 1999).**22**

Some background information on the NRA is helpful. See generally In re Bulldog Trucking, Inc., 66 F.3d 1390 (4th Cir. 1995). The NRA was passed in the wake of an outbreak of "undercharge" claims filed by insolvent carriers. Under the Interstate Commerce Act

_____

Chart, supra). Equitable defenses were not available to prevent collection of a published tariff under the filed rate doctrine. See Maislin Indus. U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116, 126-27 (1990). With the effective date of the Trucking Industry Regulatory Reform Act of 1994 ("TIRRA"), the filed rate doctrine was abolished for individually determined rates. See In re Bulldog Trucking, Inc. , 66 F.3d 1390, 1393 n.4 (4th Cir. 1995) (quoting Policy Statement on the Trucking Industry Regulatory Reform Act of 1994, 10 I.C.C.2d 251 (1994)). It stands to reason that after that time, equitable defenses became available to shippers subject to individually determined rates.

**22** Because TIRRA later limited the filed rate doctrine, and the NRA assumes the existence of the filed rate doctrine, the applicability of the NRA is relevant only as to the claims that arose before the effective date of TIRRA (i.e., as to invoices one through six, arising before August 26, 1994).

24

(ICA), 49 U.S.C. § 10101 et seq., all motor common carriers were subject to the strict filed rate doctrine. This meant they had to charge, and shippers had to pay, the officially filed rate in all circumstances. In the 1980s Congress began to deregulate the trucking industry, allowing individually negotiated rates. Deregulation did not, however, repeal the filed rate doctrine. Carriers often failed to file the individually negotiated rates. Numerous bankruptcies accompanied the deregulation initiatives. Trustees for these bankrupt carriers began to invoke the filed rate doctrine in suits against shippers who had paid the individually negotiated, but unfiled rate. The ICC's attempt to treat such "undercharge"[23] claims by carriers as unreasonable practices was rebuffed by the Supreme Court's confirmation of the supremacy of the filed rate doctrine in Maislin Industries, U.S., Inc. v. Primary Steel, Inc., 497 U.S. 116 (1990). In response to Maislin, Congress passed the NRA to combat the undercharge phenomenon.

_____

**23** There is some confusion among the courts as to what constitutes an "undercharge" dispute. All agree that an undercharge occurs when a carrier ignores the negotiated "off-tariff" rate and seeks to charge the filed rate. There seems to be some disagreement, however, whether the factual scenario at bar -- when a carrier seeks to recover late payment penalties which it allegedly had previously not enforced -- also involves "undercharges." The bankruptcy court held that it did not. This holding may have been influenced, in part, by the court's erroneous view of the facts (i.e., by the view that Humboldt had always sought to enforce the late payment penalties). In any event, several courts have characterized the situation at bar as one involving "undercharge" claims. See, e.g., Transcon Lines, 513 U.S. at 140; Lifschultz Fast Freight, Inc. v. Nat'l Mfg. Co., 804 F. Supp. 1059, 1060 (N.D. Ill. 1992); Delta Traffic Service, Inc., 730 F. Supp. at 1310. The ICC also calls Humboldt's post-bankruptcy late payment collection efforts "undercharges". See, e.g., Dillards, Fed. Carr. Cas. ¶ 38,188, 1995 WL 277124. When all is said and done, whether the case at bar is properly characterized as an "undercharge" action is irrelevant for purposes of the NRA since that word does not anywhere appear in the text of the statute. While it does appear in the title section of 49 U.S.C.A. § 13711, "the title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, [it is] of use only when [it] shed[s] light on some ambiguous word or phrase." Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-529 (1947) (citation omitted), quoted in Pa. Dept. of Corrections v. Yeskey, 524 U.S. 206, 118 S. Ct. 1952, 1955 (1998). There is no ambiguity in the text of § 13711.

Given this background, the courts below held that the Negotiated Rates Act, as evident from its title and the purpose for which it was passed, applied only to situations in which the motor carrier and the customer negotiated a rate inconsistent with the filed tariff. All agree that the present case does not involve "off-tariff" negotiated rates. Humboldt is not now seeking to charge Wise a higher, filed tariff rate in contravention of a negotiated, unfiled rate. Instead, Humboldt is merely seeking to enforce late payment provisions that have always been included in its filed tariff.

Although we do not agree with every aspect of the reasoning of the courts below, we do agree that, at least as to the per se unreasonable practice defense and the statutory settlement provisions, by its plain terms the NRA does not apply to the factual scenario at bar. Both of these provisions can only apply if the case involves rates which have been specifically negotiated and which are different from the filed tariff rate. See 49 U.S.C.A. § 13709(a)(1)(B) (West 1997 & Supp. 1999) (requiring defendant to show she was offered a rate other than that legally on file); 49 U.S.C.A. § 13711(a) and (f) (unreasonable practice to charge the difference between legally applicable rate and the "negotiated rate"). There are no such negotiated rates in the case at bar.

Under the simple terms of the statutory subsection, the small business exception of the NRA could still be applicable. See 49 U.S.C.A. § 13709(h). That provision only requires that there be a difference between the carrier's "applicable and effective tariff rate and the rate originally billed and paid." Id. Arguably, this situation exists in the case at bar. The small business exception is merely a subsection of § 13709, however. As a whole, § 13709 deals only with off-tariff negotiated rates. Thus, the reference to the "originally billed and paid" rate in 49 U.S.C.A. § 13709(h) should be read in the context of the statute as a whole to mean the originally negotiated rate. See, e.g., Bennett v. Spear, 520 U.S. 154, 174 (1997) (subsection should be interpreted in context of entire statute); Branch Banking & Trust Co. v. Fed. Deposit Ins. Corp., 172 F.3d 317, 326 (4th Cir. 1999) (court interprets statutory language in broader context of statute as a whole).

Wise cites to legislative history indicating, and several cases and administrative actions in which the ICC apparently held, that the NRA unreasonable practice defense, 49 U.S.C.A. § 13711(a), was

26

applicable to loss of discount cases like the one at bar. These sources do not change our holding. In general, legislative history only comes into play where there is an ambiguity in the statutory language. See, e.g., Connecticut National Bank v. Germain , 503 U.S. 249, 253 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: `judicial inquiry is complete.'"). Similarly, under Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), courts engage in a two-step analysis to evaluate agency interpretations of statutes. Under the first step, a court must determine whether the statute is ambiguous on the issue: "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron , 467 U.S. at 842-43. Here, there is no ambiguity in the text of the statute to justify the ICC's position or a turn to legislative history.

Therefore, we affirm the district court's conclusion that the cited portions of the NRA do not, by their terms, apply to the case at bar. Under identical reasoning, we also affirm the district court's holding that Wise may not seek referral to the Surface Transportation Board based on the aforementioned provisions of the NRA.

VII.**24**

---

**24** The bankruptcy court found that Wise had waived the right to challenge the applicability of the late payment fees for shipments moving after August 25, 1994 (invoices 7-15 on the Past Due Chart, supra). The court found (1) that Wise had only 180-days after receipt of the bill to challenge these fees under 49 U.S.C.A. § 13710(a)(3)(B) (West 1997), and (2) it was undisputed that 180 days had passed since the original bills and subsequent Past Due bills were received by Wise at the time of the bankruptcy hearing. Because we reject the court's view that this latter fact is undisputed, we also reject the court's application of the 180 day limit. There is a genuine issue of material fact whether Wise ever received the original bills and/or Past Due bills which included the late payment penalty. Clearly Wise could not challenge imposition of the late payment penalties if they had never been imposed. This is an issue that must be resolved at trial. See also National Association of Freight Transportation Consultants, Inc. -- Petition for Declaratory Order, Docket No. 41826, 1997 Fed. Carr. Cas. (CCH) ¶ 38,308, pp. 48,130-131 (STB April 21, 1997) (shipper may still raise defenses to action to collect damages even after 180 day period has expired; 180 day period only applies to actions initiated by shippers).

Finally, Wise contends that several of Humboldt's claims are barred by the statute of limitations imposed by the Interstate Commerce Commission Termination Act ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, effective January 1, 1996.

Once again, some background is helpful to resolution of this issue. The NRA established three statutes of limitations periods relating to claims for transportation charges. The NRA explicitly preserved the three year limitations period for transportation services performed prior to its effective date. NRA § 3(a), codified at former 49 U.S.C. § 11706(a). None of the shipments at issue occurred during that time. It changed to two years the statute of limitations relating to transportation services provided between December 3, 1993 through December 2, 1994. NRA § 3(a)(1). Eight of fifteen shipments occurred within this time period (invoices 1-8). The NRA also changed to 18 months the statute of limitations for claims relating to transportation services provided after December 2, 1994. NRA § 3(a)(2).

The ICCTA once again altered the statute of limitations on all actions relating to transportation services, making it 18 months. Wise argues that the ICCTA's statute of limitations was immediately effective as against all claims. Thus, six of Humboldt's fifteen claims (claims 1-6, originating prior to August 7, 1994) [25] are untimely under 49 U.S.C.A. § 14705(a) & (g) (West 1997). To make Wise's position clear, under its theory, actions which would have been timely before passage of the ICCTA (because of the two-year statute of limitations preserved under the NRA) are time barred after its passage (because of the 18 month statute of limitations under the ICCTA).

The bankruptcy and district courts rejected Wise's position. The courts were persuaded principally by the constitutional concerns that would be associated with a retroactive reduction in the statute of limi-

_____

[25] Because Humboldt filed for bankruptcy, it had a two year extension of time in which to commence an action that otherwise would have been timely had the debtor filed suit on the date when its petition in bankruptcy was filed. 11 U.S.C.A. § 108(a) (West 1993). For purposes of calculating the statute of limitations in this matter, the date on which Humboldt filed its petition in bankruptcy, i.e., February 7, 1996, was the operative date.

28

tations. See Landgraf v. USI Film Products, 511 U.S. 244, 272 (1994); Bowen v. Georgetown University Hosp., 488 U.S. 204, 208 (1988); Chenault v. U.S. Postal Serv., 37 F.3d 535, 539 (9th Cir. 1994) ("A newly enacted statute that shortens the applicable statute of limitations may not be applied retroactively to bar a plaintiff's claim that might otherwise be brought under the old statutory scheme because to do so would be manifestly unjust."). Cf. also Saint Francis College v. Al-Khazraji, 481 U.S. 604, 608-09 (1987) (noting manifestly inequitable result of retroactive change in statute of limitations). Under Landgraf, there is a presumption against retroactivity when a statute would impair rights existing prior to the passage of the legislation; for such a statute to be given retroactive effect, it must contain explicit language of retroactivity.[26] Landgraf, 511 U.S. at 280. The courts found that the ICCTA contained no express language and indicated no clear intention to retroactively alter the limitations period for claims which would have been valid under the NRA. Therefore, the courts concluded that the ICCTA limitations period only operates prospectively.

On that point we affirm the courts below. In the ICCTA, Congress did not speak with the clarity required by Landgraf retroactively to cancel previously valid claims. Accordingly, Humboldt's claims are timely.

VIII.

To conclude this complicated case, we hold that Humboldt's suit to collect its disputed late payment penalties is a non-core proceeding. We hold, as well, that it was inappropriate for the district court and the bankruptcy court to grant summary judgment when there were genuine issues of material fact. Wise presented ample evidence creating material uncertainties with regard to Humboldt's compliance with the requirements of 49 C.F.R. part 1320.2(g). Specifically, Wise presented evidence calling into question whether Humboldt ever presented Wise with original bills for most of the claims, whether Hum-

---

[26] Under Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059, 2063-64 (1997), a court should also examine the statute to see if, under normal rules of statutory interpretation, the possibility of retroactive effect is removed.

boldt ever presented Wise with Past Due bills for most of the claims, and whether Humboldt ever sought to collect late payment penalties for most of the claims. Wise's evidence was sufficient to call into question the validity of Humboldt's <u>post hoc</u> virtual recreations of its billing practices. We also find that Wise presented evidence sufficient to create a genuine issue of material fact as to whether some of Humboldt's claims may be subject to equitable defenses and/or a defense of unreasonableness. We reverse and remand for resolution of each of the above issues. We affirm the district court's holding that the portions of the Negotiated Rates Act invoked by Wise are not applicable to the case at bar. We also affirm the holding that the ICCTA's new statute of limitations does not serve to retroactively bar Humboldt's formerly valid claims. In all other respects we affirm the district court. The case accordingly is

<u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED</u>.

30